UNITED STATES of America,
Plaintiff–Appellee,

v.

Edelmiro Augustin FERNANDEZ,
Defendant–Appellant.

No. 93–4011.

United States Court of Appeals,
Tenth Circuit.

March 11, 1994.

Edward K. Brass, Salt Lake City, UT, for defendant-appellant.

Scott M. Matheson, Jr., U.S. Atty., and Kevin L. Sundwall, Asst. U.S. Atty., Salt Lake City, UT, for plaintiff-appellee.

Before SEYMOUR and MOORE, Circuit Judges, and BROWN,* District Judge.

SEYMOUR, Circuit Judge.

Defendant Edemiro A. Fernandez was indicted by a federal grand jury for possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) (1988). Fernandez filed a motion to suppress evidence. After an evidentiary hearing, the magistrate judge recommended denying Fernandez's motion to suppress. The district court adopted the magistrate's Report and Recommendation in its entirety. Fernandez entered a conditional guilty plea reserving his right to appeal the denial of his motion to suppress on Fourth Amendment grounds. After reviewing the record, we reverse.

## I.

Trooper Lance Bushnell of the Utah Highway Patrol was patrolling southbound on Interstate 15 near Nephi, Utah when he observed a blue GMC pickup truck with a camper shell traveling northbound. He noticed the windows appeared to be tinted darker than permitted under Utah law. Bushnell went to the next turnaround, turned north onto the highway, and traveled about eight or nine miles before he caught up with the truck, which was apparently traveling fast. At no time did Bushnell clock the truck's speed or plan to stop it for a speeding violation. When Bushnell eventually caught up with the truck, he pulled alongside it to visually confirm that the windows were too dark. He noticed the driver's side window was one third down and that the driver, Fernandez, glanced over at him. The truck then pulled partially over into the emergency lane on the right side of the highway and traveled there for approximately a quarter of a mile at reduced speed. Bushnell had not yet activated the patrol lights of his vehicle. Bushnell considered the driver's behavior un-usual and suspicious. He dropped back behind the truck, and the truck reentered the travel lane of the highway and resumed its speed. Bushnell then activated his lights and pulled the truck over for excessively tinted windows and improper lane travel.

Bushnell approached the vehicle and asked for Fernandez's driver's license and registration. Both documents were in Fernandez's name. Bushnell felt a "tension in the air" and noticed Fernandez's hand was trembling when he reached for his registration. Aplt. App., Suppression Hearing, 1/8/92, at 24, 26 (hereinafter Aplt.App.). Blanch, the passenger, was sleeping on the front seat next to Fernandez, and a young boy was behind the front seat. During the encounter Blanch woke up and appeared startled upon seeing a trooper in the window of the truck. He sat stiffly during the encounter. Bushnell asked for and received Blanch's identification.

In response to Bushnell's inquiries, Fernandez and Blanch informed Bushnell that the boy was Blanch's son and that they were taking him from Los Angeles to Chicago to visit his grandmother. This seemed unusual to Bushnell who asked if it wasn't more cost-effective or efficient to fly the boy to Chicago instead of driving. Mr. Fernandez replied that they had checked on airline tickets and mentioned a price of $500. Bushnell then returned to his patrol car with Fernandez's license and registration. Bushnell testified that due to the truck occupants' nervousness, he became suspicious and concerned for his safety. He therefore radioed for backup and requested a NCIC computer check on the vehicle and its occupants.

Officer Mangelson arrived after six or seven minutes to assist Bushnell. As Bushnell returned to the driver's side of the truck, Mangelson approached the passenger side. Bushnell had a warning citation and Fernandez's license and registration in his possession. He also retained Blanch's identification. Without returning these papers, Bushnell started to ask a series of questions. He asked if there were any weapons in the truck and also inquired whether there were any

---

* Honorable Wesley E. Brown, Senior District Judge, United States District Court for the District of Kansas, sitting by designation.

876

drugs or other contraband in the vehicle. Fernandez replied in the negative, and both occupants said they did not use drugs. Bushnell asked Fernandez why he was so nervous. During his testimony at the suppression hearing, Bushnell could not recall Fernandez's response, but he did recall that the answer was unsatisfactory. Fernandez and Blanch appeared to get increasingly nervous as the encounter continued.

Bushnell testified that Fernandez was not free to leave once he had been stopped. Without returning Fernandez's license or registration, or Blanch's identification, Bushnell asked for permission to look in the truck. Fernandez and Blanch started to exit the vehicle without answering Bushnell verbally so Bushnell asked Fernandez again, "Do you understand I want to search the truck?" Fernandez replied, "I understand, go ahead." Brief of Aplt., App. at 10 (Magistrate Report & Recommendation) (hereinafter Report); Aplt.App. at 39.

Bushnell and Mangelson started searching the truck together. As they pushed the front seat forward, they observed a compartment covered by a piece of carpet. When they pulled back the carpet, they saw through a seam in the compartment what appeared to be numerous kilograms of cocaine. The troopers arrested Fernandez and Blanch. An inventory search of the truck uncovered 123 kilograms of cocaine in various hidden compartments.

The magistrate judge concluded that the stop was not pretextual because the Utah Highway Patrol Unit to which Bushnell was assigned regularly enforces the tinted window law by arresting or issuing citations to Utah drivers and warning out-of-state drivers who are in violation of the law. The magistrate judge found that Fernandez's driver's license and vehicle registration were not returned to him until after the arrest, but held that Bushnell had reasonable suspicion justifying the continued detention. Finally, although the magistrate judge found that "at the time of the consent to search Fernandez was still being detained," Report at 20–21, he nevertheless held that Fernandez's consent to search was voluntary. He denied the motion to suppress and the district court

adopted the Report and Recommendation in its entirety.

## II.

In reviewing the Fourth Amendment claims of Fernandez, we uphold the factual findings of the district court unless they are clearly erroneous. *United States v. Walker,* 933 F.2d 812, 815 (10th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992). We are mindful that at a hearing on a motion to suppress, the credibility of the witnesses and the weight given to the evidence, as well as the inferences and conclusions drawn therefrom, are matters for the trial judge. *United States v. Werking,* 915 F.2d 1404, 1406 (10th Cir.1990). However, the ultimate determination of reasonableness under the Fourth Amendment is a question of law which we review de novo. *Walker,* 933 F.2d at 815.

Fernandez raises three Fourth Amendment claims. First, he contends the stop was pretextual because a reasonable officer under the circumstances would not have made the stop in the absence of an invalid purpose. Second, he argues that his detention beyond the time necessary to issue a citation was not based on reasonable suspicion. Finally, he contends that he did not give free and intelligent consent to search his truck. We address each of these claims in turn.

## A.

A pretextual stop occurs when an officer uses some legal justification to stop a person or vehicle in order to investigate unrelated criminal matters for which the officer lacks reasonable suspicion. *See United States v. Guzman,* 864 F.2d 1512, 1515 (10th Cir.1988). In *Guzman,* we defined the test to be applied to claims of pretextual stop. To determine whether an investigative detention is unconstitutional as a pretext we ask " 'not whether the officer *could* validly have made the stop, but whether under the same circumstances a reasonable officer *would* have made the stop in the absence of the invalid purpose.' " *Id.* at 1517 (quoting *Unit-*

*ed States v. Smith,* 799 F.2d 704, 709 (11th Cir.1986)).

■ Applying the *Guzman* test, the district court concluded that the stop was not pretextual. It stated that Bushnell and the "Utah Highway Patrol unit to which Trooper Bushnell was attached enforced the Utah window tinting law on a regular basis." Aplt. App. at 8, 11. The district court noted that it is the policy of the Utah Highway Patrol Unit to which Bushnell is assigned to issue warning tickets to out-of-state vehicles in violation of the tinted window law and that Bushnell issued sixty-three such warnings between July and November of 1991, as well as seven citations. Thus, it appears that Bushnell routinely stops and issues warning citations to out-of-state motorists for excessively tinted windows. The routine practices of an individual officer, however, will not preclude a finding of pretext if an objectively *reasonable* officer under the same circumstances would not have made the stop absent an invalid purpose. *See Guzman,* 864 F.2d at 1517.

There is considerable objective evidence in the record suggesting that, although this stop was not unusual for Bushnell, a reasonable officer in the same circumstances might not have stopped Fernandez's truck in this case. For example, while Bushnell issued sixty-three warning citations for tinted windows over a five month period, statistics for Bushnell's unit reveal that in the same five month period one officer issued no warnings, two officers issued one warning each, one officer issued three warnings, and another officer issued twenty warnings. *See* Aplt. App., exh. at 13. Assuming, in accordance with the stated policy of Bushnell's unit, that

each of these warning citations resulted from the stop of an out-of-state vehicle such as the truck at issue in this appeal, it appears that Bushnell regularly stops and issues warnings to such motorists significantly more than his counterparts.[1] The evidence reveals a similar trend with respect to the improper lane travel violations. Bushnell issued forty-four warnings for improper lane travel in a five month period while his five fellow officers issued between zero and five warnings. *Id.* In addition to these statistics, the record reveals that Bushnell observed the tinted window violation from across the highway while travelling in the opposite direction as Fernandez's truck. He then drove to the next turnaround, crossed over the highway, and pursued the truck for approximately eight or nine miles before actually pulling it over. We question whether such a stop would be "business as usual" for a reasonable officer under the same circumstances. *See Werking,* 915 F.2d at 1408.

Looking at all this evidence together, it is not a foregone conclusion that a reasonable officer under the same circumstances would have stopped Fernandez's truck, even viewing the alleged violations together as Bushnell did.[2] Despite evidence suggesting this stop may have been pretextual, however, we expressly decline to decide this issue, as we reverse on other grounds.

**B.**

■ Fernandez next contends that he was unlawfully seized when Bushnell detained him without reasonable suspicion beyond the time necessary to issue a citation. With respect to investigative detentions of automobiles it is well established in this circuit that

---

1. The dissent criticizes our use of statistics concerning Bushnell's issuance of warning citations and cites *United States v. Harris,* 995 F.2d 1004, 1005 (10th Cir.1993), for the proposition that it is immaterial whether an officer would issue a formal citation or an informal warning. *Harris* 's reasoning is inapplicable, however, where, as here, the stated policy of Bushnell's unit was to issue warnings to out-of-state vehicles and citations to Utah vehicles. The individual officer's statistics on the issuance of warning tickets and citations therefore provides some objective measure of the comparative frequency with which the officers make each type of stop.

2. When Bushnell pulled alongside Fernandez and started to scrutinize the vehicle, Fernandez reduced his speed and pulled his truck into the emergency lane. When Bushnell did not activate the lights and dropped back behind Fernandez, the pickup truck reentered the highway and resumed its speed. It is highly plausible that Fernandez thought he was being pulled over, and we find it interesting that Bushnell could not recall Fernandez's response when Bushnell asked why he pulled into the emergency lane. Contrary to the dissent's assertion, this lack of memory is an objective factor a district court may consider when making its judgment concerning pretext.

[a]n officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation. When the driver has produced a valid license and proof that he is entitled to operate the car, he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning.

*Guzman,* 864 F.2d at 1519 (citations omitted); *see also Walker,* 933 F.2d at 815–16.

Given the factual finding that Bushnell retained Fernandez's license and registration until after the arrest was made, there is no question that Fernandez was seized when Bushnell returned to the truck and started asking questions unrelated to the traffic stop. The issue we face is whether Bushnell had objectively reasonable suspicion justifying the continued seizure of Fernandez.

Relying on the truck's improper lane travel, Fernandez's "extreme nervousness," and the passenger's "unusual behavior," the Report adopted by the district court concluded the seizure was based on reasonable suspicion. Report at 21–22. The district court distinguished the present case from *Guzman* and *Walker* because "this case does not involve a 'routine traffic investigation.'" *Id.* at 21. Finally, the court relied largely on *United States v. Walraven,* 892 F.2d 972 (10th Cir.1989), as support for the conclusion that reasonable suspicion existed. While we do not find the factual findings of the lower court to be clearly erroneous, we disagree with its legal conclusion and hold that reasonable suspicion did not exist in this case.

Bushnell's continued detention of Fernandez can only be justified if "specific and articulable facts and rational inferences drawn from those facts [gave] rise to a reasonable suspicion" of criminal activity. *Werking,* 915 F.2d at 1407. An officer's "inchoate and unparticularized suspicion or 'hunch'" is insufficient to give rise to reasonable suspicion. *United States v. Sokolow,*

490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989); *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968). We determine whether reasonable suspicion exists by examining the totality of the circumstances. *Sokolow,* 490 U.S. at 8, 109 S.Ct. at 1585–86; *United States v. Ward,* 961 F.2d 1526, 1529 (10th Cir.1992).

Fernandez does not argue that Bushnell lacked reasonable suspicion to make the initial traffic stop, but that he was unlawfully detained beyond the time necessary to issue the initial traffic citation. *See United States v. Soto,* 988 F.2d 1548, 1555 (10th Cir.1993) ("When [the officer] questioned defendant about matters unrelated to the initial traffic stop, the detention entered a new phase."). At the time Bushnell returned to the truck with the warning citation and began asking questions about drugs and weapons, the evidence shows that, although Fernandez and his passenger were nervous, Fernandez had a valid driver's license and registration, *both in his own name,* and that Fernandez and his passenger Blanch gave a consistent and very plausible explanation of their travel.[3] The three factors relied upon by the district court are insufficient to create reasonable suspicion under the circumstances of this case. First, the improper lane travel violation partly justified the initial stop of Fernandez and was sufficiently minor to warrant only a warning citation. This is not a case where a defendant's evasive action or failure to pull over promptly in response to a trooper's flashing lights is an objective indication of something more serious than a minor traffic infraction. *See United States v. Sharpe,* 470 U.S. 675, 682 n. 3, 105 S.Ct. 1568, 1573 n. 3, 84 L.Ed.2d 605 (1985) (evasive actions of defendants' vehicles one of many factors supporting reasonable suspicion); *United States v. Paleo,* 967 F.2d 7, 9 (1st Cir.1992) (flight of vehicle police signalled to stop for speeding one of several factors creating reasonable suspicion of drug activity); *Walraven,* 892

---

**3.** The fact that Fernandez and Blanch were driving Blanch's son to visit a relative in Chicago instead of flying him there allegedly aroused Bushnell's suspicions. However, the district court quite correctly concluded that many people do not like or can not afford air travel. The court therefore did not consider the suspects'

F.2d at 975 [4] (defendants' failure to stop car promptly in response to police car's flashing lights and siren supports finding of reasonable suspicion). In this case, Fernandez immediately pulled over when Bushnell activated his flashing lights. While Bushnell found Fernandez' improper lane travel unusual, as we noted *supra* at n. 2, an innocent cautious driver might well believe an officer who pulls alongside him on the highway and stays there looking at him intends for him to pull over. Under the circumstances, reducing one's speed and moving into the emergency lane hardly gives an officer reasonable suspicion to believe some other serious crime had been or was being committed.

The second and third factors relied upon to support the claim of reasonable suspicion involve the unusual nervousness of Fernandez and the startled awakening and stiff demeanor of passenger Blanch. We have repeatedly held that nervousness is of limited significance in determining reasonable suspicion and that the government's repetitive reliance on the nervousness of either the driver or passenger as a basis for reasonable suspicion "in all cases of this kind must be treated with caution. It is common knowledge that most citizens, and especially aliens, whether innocent or guilty, when confronted by a law enforcement officer who asks them potentially incriminating questions are likely to exhibit some signs of nervousness." *United States v. Millan–Diaz*, 975 F.2d 720, 722 (10th Cir.1992); *see also United States v. Peters*, 10 F.3d 1517, 1521 (10th Cir.1993) (" 'While a person's nervous behavior may be relevant, we are wary of the objective suspicion supplied by generic claims that a Defendant was nervous or exhibited nervous behavior after being confronted by law enforcement officials....' ") (quoting *United States v. Hall*, 978 F.2d 616, 621 n. 4 (10th Cir. 1992)); *Walker*, 933 F.2d at 817; *Guzman*,

864 F.2d at 1520. The lower court's heavy reliance on nervousness as an important factor establishing reasonable suspicion is even more troublesome given the complete lack of evidence in the record that Bushnell had any prior knowledge of Fernandez or Blanch to make an evaluation of their behavior. In this respect we find the instant case strikingly similar to *United States v. Bloom*, 975 F.2d 1447 (10th Cir.1992), where this court held that a border patrol agent's "statement that Defendant appeared 'very nervous' and 'somewhat excited' is a subjective evaluation of Defendant's behavior." 975 F.2d at 1458. The court went on to say that

> Nothing in the record indicates whether Agent Ochoa had any prior knowledge of Defendant, so we do not understand how Agent Ochoa would know whether Defendant was acting nervous and excited or whether he was merely acting in his normal manner. Rather, Defendant's appearance to Agent Ochoa is nothing more than an "inchoate suspicion or hunch"....

*Id.* (citations omitted).

In making its reasonable suspicion determination below, we think the lower court failed to recognize an important distinction between this case and our other cases in this area. More specifically, a defining characteristic of our traffic stop jurisprudence is the defendant's lack of a valid registration, license, bill of sale, or some other indicia of proof to lawfully operate and possess the vehicle in question, thus giving rise to objectively reasonable suspicion that the vehicle may be stolen. *See, e.g., Soto*, 988 F.2d at 1556 (car registration allegedly in uncle's name and defendant completely failed to respond when asked for uncle's address); *United States v. Horn*, 970 F.2d 728, 732 (10th Cir.1992) (unnotarized bill of sale written on back of envelope and title in different person's name); *United States v. Turner*, 928

form of travel as a factor contributing to reasonable suspicion. Report at 20 n. 6.

4. We think the lower court relied too heavily on *Walraven* in finding reasonable suspicion below. *Walraven* is distinguishable from the instant case in that defendants in *Walraven* failed to pull over promptly when the officer activated his overhead lights and siren. They also conferred with one another and actively observed the police officer

during the pursuit. It is well recognized that a defendant's intentional flight from police officers may be used as circumstantial evidence of guilt. *See United States v. Slater*, 971 F.2d 626, 636 n. 4 (10th Cir.1992). Furthermore, unlike Bushnell's vague sense that something was afoot in the present case, the officer in *Walraven* reasonably suspected the detained defendants were drug couriers. 892 F.2d at 974.

F.2d 956, 959 (10th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 230, 116 L.Ed.2d 187 (1991) (car not registered to defendant or passenger); *United States v. Pena,* 920 F.2d 1509, 1514 (10th Cir.1990) (no registration or proof driver entitled to operate car), *cert. denied,* 501 U.S. 1207, 111 S.Ct. 2802, 115 L.Ed.2d 975 (1991); *United States v. Arango,* 912 F.2d 441, 447 (10th Cir.1990) (no credible proof that defendant lawfully possessed truck), *cert. denied,* 499 U.S. 924, 111 S.Ct. 1318, 113 L.Ed.2d 251 (1991); *United States v. Rivera,* 867 F.2d 1261, 1264 (10th Cir.1989) (defendant unable to produce ownership papers); *United States v. Gonzalez,* 763 F.2d 1127, 1130 (10th Cir.1985) (driver licensed in New York, driving car with California plates and registered to California owner, and carrying unsigned title); *United States v. Obregon,* 748 F.2d 1371, 1376 (10th Cir.1984) (car rented in another's name, driver not listed as authorized driver, and driver unable to provide means of contacting lessee); *cf. Guzman,* 864 F.2d at 1519 (no reasonable suspicion where officer received proper license and registration and confirmed car not stolen).

While nervousness may also appear as a factor in many traffic stop cases, we have never held that by itself it creates a reasonable suspicion of criminal activity. In the instant case, Fernandez provided Bushnell with a valid license and registration, *both in his own name.* At no time did Bushnell attempt to justify the continued detention of Fernandez based on any specific, objective factors supporting a reasonable inference that the truck was stolen, that the defendant was trafficking in drugs, or that he was committing any other criminal offense. *Cf., e.g., United States v. Corral,* 899 F.2d 991, 992 (10th Cir.1990) (spare tire out of place and bulge in tire well basis of reasonable suspicion); *United States v. Stone,* 866 F.2d 359, 362 (10th Cir.1989) (officer's smell of patchouli oil often used to mask smell of marijuana basis of reasonable suspicion that car carried contraband).

After examining the totality of the circumstances, we conclude there was insufficient evidence in this case to establish reasonable suspicion justifying the continued detention of Fernandez. Bushnell's testimony regarding his "sixth sense," his detection of a "tension in the air," and his belief that something was "afoot," strongly suggests he was acting more on an unparticularized hunch than on reasonable and objective suspicion.[5] *See*

---

**5.** The record is replete with testimony showing Bushnell acted based on his subjective, unparticularized hunch that something was wrong. When asked to describe the encounter with the suspects, Bushnell stated: "Definitely tension in the air, the way I perceived that is that they knew something I didn't know." Aplt.App. at 24. Referring to the nervous reaction of Fernandez and Blanch, Bushnell stated:

My experience has shown that when someone acts and displays those type of mannerisms there is something afoot that I said before[,] I perceived they know something that I don't know, there is something making them nervous and also as an officer, I feel an obligation and responsibility to pursue whatever is making them nervous.

Aplt.App. at 29.

In one passage Bushnell is asked to tell the Court what he notices about traffic stops that result in further criminal inquiry or sometimes arrest for crimes other than traffic violations:

Q [by United States] Tell the Court what that might be?

A [by Bushnell] Generally without fail, there are exceptions, but there, the first thing that I will notice is nerves, they always exhibit these nervous mannerisms. *There is almost and you can, you know, sixth sense whatever*

*you want to call it, but it is almost a tension in the air. You can feel the tension* and I think that is what keeps officers, you know, officers safe or safety keeps them alive. They can feel that tension there.

Q Is this based on your experience?

A Yes, sir.

Q And based on training you have received?

A *No, I don't think you can train to pick up on that. That is part of nervousness and tension in the air.*

Aplt.App. at 23–24 (emphasis added).

At one point the government asked Bushnell:

Q [by United States] Did you have any idea specifically what you were suspicious about or worried about?

A [by Bushnell] *No, I would like to have known myself.* That is why I was curious enough to check into it. I don't know whether they were wanted[,] whether they had just done something they feel that they could be caught for, maybe they just stole some gas or whatever. They were definitely nervous about something.

Aplt.App. at 32 (emphasis added).

Finally, when asked on cross-examination about what specifically gave him concern for his safety Bushnell responded:

*United States v. Lyons,* 7 F.3d 973, 976 (10th Cir.1993) (holding stop pretextual where officer relied on "sixth sense" that driver was impaired and noting such reliance "is merely the manifestation of a hunch that something foul is afoot").

In support of the lower court's finding below, the dissent points to two factors that we find particularly unconvincing under the circumstances of this case. First, the dissent suggests that Bushnell's initial thought that Fernandez might be driving under the influence somehow justified his continued detention. Even though Bushnell may have been suspicious of this possibility initially, however, he testified that this was not one of the reasons he actually stopped Fernandez. Aplt.App. at 56. Moreover, after he made the initial stop, Bushnell "administered no roadside sobriety tests; did not request the defendant submit to blood, breath, or urine tests; and issued no citation for driving while impaired." *Lyons,* 7 F.3d at 975. Indeed, the record is devoid of anything indicating that after their initial encounter Bushnell thought Fernandez was impaired or that he continued to detain and question Fernandez to determine if he was impaired. This factor is therefore totally irrelevant to any analysis. Second, the dissent points to Bushnell's concern for his safety as a justification for Fernandez's continued detention. As the record reveals quite clearly *supra* at n. 5, however, Bushnell's safety concerns stem from the same subjective hunch, "tension in the air," and nervousness that we have already dis-

> A [by Bushnell] I'm always, when someone gets nervous like that around me I'm always concerned for my safety being jeopardized, sir.
> Q [by counsel for Fernandez] This nervousness that you talked about?
> A: *Yes, sir, tension in the air and stuff.*

Aplt.App. at 56–57 (emphasis added).

While Bushnell's hunch turned out to be correct, we simply can not conclude from his testimony that he acted on the basis of "specific reasonable inferences" as required by *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

**6.** The dissent notes the dangers police officers face during the course of their duty and suggests that Bushnell's concerns for his safety somehow justified the continued detention and questioning of Fernandez about guns and drugs. We are cognizant of the very real dangers officers face, including when making traffic stops, *see Pennsyl-*

counted as an adequate basis for reasonable suspicion.[6]

For the reasons set out above, we hold that Trooper Bushnell did not have a sufficient objective and particularized basis supporting his suspicions, and that his continued detention of Fernandez therefore violated the Fourth Amendment.

**C.**

■ A search preceded by a Fourth Amendment violation remains valid if the consent to search was voluntary in fact under the totality of the circumstances. *Guzman,* 864 F.2d at 1520; *see also Ward,* 961 F.2d at 1534. The government bears the burden of proving the voluntariness of consent, *Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973), and that burden is heavier when consent is given after an illegal stop, *United States v. Recalde,* 761 F.2d 1448, 1457 (10th Cir.1985); *see also United States v. Deases,* 918 F.2d 118, 122 n. 1 (10th Cir.1990) ("Having concluded that the initial stop of Deases' car was lawful, the government does not have the 'heavier burden' in connection with the consent issue which it would have if the initial stop was unlawful."), *cert. denied,* —— U.S. ——, 111 S.Ct. 2859, 115 L.Ed.2d 1026 (1991). The government must establish that Fernandez's consent to search is "sufficiently an act of free will to purge the primary taint of the illegal [seizure], [or] it must be suppressed as fruit of the poisonous tree."[7]

*vania v. Mimms,* 434 U.S. 106, 110, 98 S.Ct. 330, 333, 54 L.Ed.2d 331 (1977), but an investigative detention must nonetheless be supported by reasonable suspicion. Furthermore, contrary to the dissent's suggestion, our holding today does nothing to diminish the capacity of officers to deal with their safety concerns. An officer may always call for backup, as Bushnell did here, as long as the officer does not detain a suspect without reasonable suspicion. In addition, if an officer lacking reasonable suspicion wishes to address his safety concerns by detaining a suspect for questioning about guns and drugs, he may attempt to do so on a consensual basis. *See Soto,* 988 F.2d at 1557.

**7.** The district court concluded that Fernandez's consent was voluntary. Because it found that the continued detention of Fernandez was lawfully based on reasonable suspicion, however, the

*United States v. Maez,* 872 F.2d 1444, 1453 (10th Cir.1989); *see also United States v. Lowe,* 999 F.2d 448, 451 (10th Cir.1993); *United States v. Mendoza–Salgado,* 964 F.2d 993, 1011 (10th Cir.1992); *Ward,* 961 F.2d at 1534; *Walker,* 933 F.2d at 817. When examining the totality of the circumstances, no single fact is dispositive but three factors are especially significant: "the temporal proximity of the illegal stop and the consent, any intervening circumstances, and the purpose and flagrancy of [the official] misconduct." *Guzman,* 864 F.2d at 1520, 1521 (adopting these factors from *Brown v. Illinois,* 422 U.S. 590, 603–04, 95 S.Ct. 2254, 2261–62, 45 L.Ed.2d 416 (1975)).

█ The district court found that no language problem existed between Fernandez and Bushnell, and that Bushnell retained Fernandez's documentation at the time he requested consent to search the truck. We do not disturb these factual findings, as they are not clearly erroneous. *See Mendoza–Salgado,* 964 F.2d at 1011. The record shows that Bushnell asked Fernandez if he would mind if the officer searched the truck. Without replying verbally, Fernandez and his passenger Blanch opened the doors of the truck and started to get out. Bushnell then said to Fernandez, "Do you understand I want to search the truck?", to which Fernandez replied, "I understand, go ahead." Aplt. App. at 39. Although Bushnell retained Fernandez's documentation, neither Bushnell nor the assisting trooper Mangelson informed Fernandez that he could refuse to give his consent or that he was free to leave the scene, both important factors in our consider-

ation. *See, e.g., Ward,* 961 F.2d at 1533 (informing an individual of his constitutional rights, particularly Fourth Amendment rights, is important because it shows the individual that the police are prepared to respect his assertion of those rights); *Recalde,* 761 F.2d at 1459 (consent lacking where defendant never told he was free to leave by officer holding ticket, driver's license, and registration); *United States v. Gonzalez,* 763 F.2d 1127, 1133 (10th Cir.1985) (consent fruit of illegal detention where officer retained defendant's documentation and did not inform defendant he was free to leave when handing him consent form). Although informing a defendant of his right to refuse consent is not a prerequisite to establishing voluntary consent, *Schneckloth,* 412 U.S. at 234, 93 S.Ct. at 2051, we consider it a factor "particularly worth noting," [8] *Florida v. Bostick,* 501 U.S. 429, ——, 111 S.Ct. 2382, 2385, 115 L.Ed.2d 389 (1991); *see United States v. Mendenhall,* 446 U.S. 544, 548–49, 100 S.Ct. 1870, 1873–75, 64 L.Ed.2d 497 (1980) (verbal advisement to defendant she could decline consent "especially significant"); *Ward,* 961 F.2d at 1533.

Examining the encounter between Bushnell and Fernandez in light of the fact that Bushnell had already extensively questioned Fernandez,[9] that a second officer had arrived on the scene, that Bushnell retained Fernandez's documentation, and that Fernandez was not informed of his right to refuse consent or to leave the scene, we do not consider their verbal exchange so unambiguous that Fernandez's consent was clearly voluntary in fact. In addition, the three *"Brown* factors"

court did not perform a taint analysis. A remand on this issue is unnecessary because the proceedings below " 'resulted in a record of amply sufficient detail and depth from which the determination may be made.' " *Guzman,* 864 F.2d at 1521 n. 10 (quoting *Brown v. Illinois,* 422 U.S. 590, 604, 95 S.Ct. 2254, 2262, 45 L.Ed.2d 416 (1975); *see United States v. Lowe,* 999 F.2d 448, 451 n. 5 (10th Cir.1993); *United States v. Mendoza–Salgado,* 964 F.2d 993, 1011 (10th Cir.1992); *United States v. Ward,* 961 F.2d 1526, 1534 n. 7 (10th Cir.1992); *United States v. Maez,* 872 F.2d 1444, 1454 n. 13 (10th Cir.1989).

**8.** The fact that a defendant is informed of his constitutional rights does not necessarily mean his consent will be voluntary in fact. *See Maez,*

872 F.2d at 1455–56 (holding taint of illegal police actions not purged even where defendant signed consent-to-search form after *Miranda* warnings and both written and oral notice of right to refuse); *Gonzalez,* 763 F.2d at 1133 (holding consent obtained from consent-to-search form fruit of illegal detention); *Recalde,* 761 F.2d at 1452–59 (taint not purged by *Miranda* warning and written notification of right to refuse).

**9.** "When examining the totality of the circumstances to determine 'if in fact the consent to search was coerced, account must be taken of subtly coercive police questions....' " *Mendoza–Salgado,* 964 F.2d at 1011 n. 9 (quoting *Schneckloth,* 412 U.S. at 229, 93 S.Ct. at 2049).

on which we place special emphasis all indicate Fernandez's consent was tainted by the prior unlawful seizure. First, Fernandez verbally acquiesced to the search only moments after the illegal detention and questioning by Bushnell. *See Ward*, 961 F.2d at 1534 (consent not voluntary where "only minutes" passed after illegal seizure); *Maez*, 872 F.2d at 1447, 1455, 1456 (taint of illegal arrest not purged where consent form signed thirty minutes after illegal arrest); *Recalde*, 761 F.2d at 1459 (no voluntary consent where only "several minutes" elapsed between illegal detention and signing of consent form); *cf., Mendoza–Salgado*, 964 F.2d at 1012 (considered alone, thirty to forty-five minute time period between illegal entry and defendant's consent reveals little about defendant's "decision to permit the search"); *see also Brown*, 422 U.S. at 604–05, 95 S.Ct. at 2262–63 (statement given less than two hours after illegal arrest fruit of poisonous tree). Second, there were absolutely no intervening circumstances between the illegal detention and Fernandez's consent. Both of these factors suggest that there was no "break in the causal connection between the illegality and the evidence thereby obtained." *Recalde*, 761 F.2d at 1458.

Finally, analyzing the third *Brown* factor, we conclude that the purpose and flagrancy of Bushnell's conduct also weighs heavily against a finding of voluntary consent. Bushnell testified that there was a "tension in the air," and that he believed something was "afoot." Aplt.App. at 24, 29. Bushnell felt Fernandez and Blanch were "definitely nervous," yet he had no idea what they were nervous about. *Id.* at 32. He stated with respect to the nervous mannerisms he observed in Fernandez and Blanch that: "I perceived they know something that I don't know, there is something making them nervous and also as an officer, I feel an obligation and responsibility to pursue whatever is making them nervous." *Id.* at 29. Thus, the illegal detention here "had a quality of purposefulness" in that Bushnell continued to detain Fernandez based solely on a tension in the air and his vague hunch that something was afoot, with "the hope that something might turn up." *Brown*, 422 U.S. at 605, 95 S.Ct. at 2262; *see Recalde*, 761 F.2d at 1459;

*see also Ward*, 961 F.2d at 1535. By illegally detaining Fernandez, failing to return his documentation, and failing to inform him of both his right to leave the scene and to refuse consent, Bushnell's conduct was sufficiently egregious that it tainted Fernandez's consent.

Law enforcement officials must obey the requirements of the Fourth Amendment when performing their duties. We place particular emphasis on the Fourth Amendment "concern that evidence not be obtained by exploitation of illegal police conduct." *Walker*, 933 F.2d at 817–18. Accordingly, we hold that any consent Fernandez may have given was not "sufficiently free of duress and coercion so as to remove the taint of the illegal detention." *Recalde*, 761 F.2d at 1459. We therefore REVERSE the district court's denial of Fernandez's motion to suppress.

REVERSED and REMANDED.

WESLEY E. BROWN, Senior District Judge, dissenting.

I respectfully dissent. I would find that the defendant's Fourth Amendment rights were not violated, and I would affirm the district court.

I cannot join in the approach taken by the majority in Section B for two reasons: First, I think the majority fails to address fully the factual findings made by the magistrate and fails to view the record in a light most favorable to those findings. Second, I think the majority erroneously discounts the factors underlying the officer's reasonable suspicion and reasonable concern for his safety.

*Facts.* The starting point for appellate review of the district court's ruling must be the facts as determined by the finder of fact. Based on the trooper's entire testimony, the magistrate made extensive findings of fact in this case. He found that Trooper Bushnell noticed that the windows on the defendant's truck were very dark. The trooper testified that the windows were dark enough that he could not see inside the truck. Bushnell decided to stop the vehicle for a window-tint violation. The trooper, who was traveling south, turned around and pursued the vehicle which was northbound. The vehicle was

traveling very fast, and it took the trooper eight to nine miles to overtake it. The trooper pulled alongside the vehicle to confirm that the windows were too dark. When he did so, the defendant "pulled [his] vehicle about two thirds into the emergency lane even though the trooper had not signaled the vehicle to pull over or turned on its lights. The trooper considered the conduct very unusual and suspicious. The trooper pulled behind the defendants' vehicle and then it reentered the traffic lane and sped up." The trooper believed the driver might be under the influence of alcohol or have some other problem. Bushnell turned on his lights and stopped the vehicle for the window tint and improper lane operation. Bushnell approached the driver, defendant Fernandez, and asked for a driver's license and registration and told him the purpose of the stop. The magistrate found that "[a]s Fernandez produced his driver's license his hand trembled. Fernandez was unusually nervous which with the erratic driving caused the trooper to believe something was 'afoot.' When the trooper asked Fernandez why he was so nervous, the trooper did not receive a satisfactory explanation." The trooper testified that he discussed with the defendant whether the defendant was driving under the influence and also questioned the defendant as to why he drove off the road in the manner that he did.

The magistrate determined that Trooper Bushnell does not have a threatening presence, that he is of modest height and build, and that he tried to put Fernandez at ease during the stop. The magistrate indicated that Fernandez's nervousness "did not abate" during the stop, was "excessive," and that "this was unusual." Additionally, Mr. Blanch, who was asleep when Bushnell first approached the driver, awoke and appeared startled upon seeing Bushnell. Blanch popped up in the seat and sat rigidly. He continued to sit erectly throughout the encounter. His reaction was unusual. The magistrate found that "Trooper Bushnell was very suspicious and concerned about his own safety." Bushnell testified that under the circumstances the fact that there were two adults in the truck caused him some concern for his safety. The magistrate noted that

Bushnell was sufficiently concerned about his safety that he called for backup. Bushnell also radioed for an NCIC check on the vehicle and occupants, but he did not receive a reply. Bushnell wrote up a warning citation for the defendant. Sergeant Mangelson, the backup officer, arrived in six to seven minutes. When Mangelson arrived, Bushnell returned to the vehicle and proceeded to ask Fernandez if there was a gun in the vehicle. He also asked if there were any illegal drugs. When Fernandez stated that neither of these items were present in the vehicle, the trooper asked for and was given consent to search for them.

*Investigative Detention.* The majority concludes that the trooper's decision to detain the defendant for a few minutes for the purpose of asking about guns or drugs was based on nothing more than the trooper's unparticularized hunch of wrongdoing. I concede that selected portions of the trooper's testimony at the suppression hearing can be used to support this view. The trooper cited a feeling of "tension in the air," his "sixth sense," and his belief that "something was afoot" as partial explanations for his conduct. Clearly, such testimony by itself would not constitute specific and articulable facts sufficient to justify a detention. We are required to look at all of the evidence, however, to determine if the facts warranted a reasonable officer in suspecting that criminal activity was afoot or in believing that his safety was in danger. Moreover, we are required to uphold the suppression ruling if there is any reasonable view of the evidence to support it. *See United States v. Neu,* 879 F.2d 805, 807 (10th Cir.1989).

Given the "minimal level of objective justification" that is required for a brief detention of the type at issue here, *see INS v. Delgado,* 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984), as well as our deferential review of the facts found by the magistrate, I have some trouble with the approach taken by the majority opinion. The majority discounts the significance of Mr. Fernandez's erratic driving by stating that it "was sufficiently minor to warrant only a warning citation." Whether or not the trooper issued a warning citation is beside the point. The point is that

the defendant's conduct provided a specific factual basis that contributed to a finding of a reasonable suspicion and a reasonable concern for the officer's safety. The defendant's conduct was considered by the officer, who has made thousands of traffic stops, to be unusual and erratic. Under the circumstances, the trooper reasonably attached a certain degree of suspicion to the defendant's actions. The majority is confident from its reading of a typed transcript that the defendant's actions were innocuous, explaining that "it is highly plausible that Fernandez thought he was being pulled over" and that "an innocent cautious driver might well believe an officer who pulls along beside him on the highway and stays there looking at him intends for him to pull over." Whether or not this speculative interpretation of the record is true,[1] in either case it is clearly not dispositive. It is always possible to construct an innocent explanation for what can also be reasonably interpreted as behavior indicative of criminal activity. *Cf. Terry v. Ohio, supra* (Three men walking up and down a street, looking in a store window). Moreover, such speculation misses the mark because what the driver may or may not have been thinking is not the proper focal point for purposes of the Fourth Amendment.

The central question is whether the officer reasonably attached any suspicion to the defendant's actions. The majority's dismissal of the erratic driving as a factor of any significance seems to me to substitute this court's judgment for that of the officer in the field—who was called upon to make a quick decision based upon his training and experience. *See United States v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) (the court "should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not engage in unrealistic second-guessing.") Thus, the majority is able to declare that "[t]his is not a case where a defendant's evasive action ... is an objective indication of something more serious than a minor traffic infraction" only by substituting its judgment for that of an officer who has made thousands of traffic stops and whose testimony indicated that the defendant's actions were very unusual and caused him concern for his safety. In my view the majority's approach is inconsistent with the Supreme Court's view of the reasonable suspicion analysis:

> The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers. [T]he evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

*United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981).

The officer in this case was legitimately concerned about the reason for the defendant's erratic driving. *Cf. United States v. Brignoni-Ponce,* 422 U.S. 873, 885, 95 S.Ct. 2574, 2582, 45 L.Ed.2d 607 (1975) (In determining whether there is reasonable suspicion to believe that a car contains illegal aliens, "[t]he driver's behavior may be relevant, as erratic driving or obvious attempts to evade officers can support a reasonable suspicion.") The officer's testimony indicated that based on the driver's actions he believed that the driver may have been under the influence of alcohol or had some other problem.[2] He was concerned as to why the defendant acted in such a manner at the mere sight of an officer. The majority correctly notes that Fernandez did not appear to be under the influence of alcohol when Bushnell talked to him. What the majority fails to add is that nothing that occurred during the course of the stop

---

1. If Mr. Fernandez thought the officer intended for him to pull over, why did Mr. Fernandez speed up and pull back onto the road when the officer pulled in behind him?

2. The majority states that Bushnell testified that "this was not one of the reasons he actually stopped Fernandez." The trooper testified that he made the stop because of the improper lane change and the tinted windows. He did not testify, as the majority's statement might suggest, that he was unconcerned with the reason for the defendant's erratic driving.

served to dispel the officer's concerns or to explain the reason for the defendant's actions. To the contrary, Mr. Fernandez's and the passenger's excessive nervousness only increased the officer's legitimate concerns.

The majority also undertakes what may best be described as a systematic discounting of the significance of the nervous behavior exhibited by the defendant and the passenger in the course of this traffic stop, noting that "we have never held that by itself [nervousness] creates a reasonable suspicion of criminal activity." By the same token, we have never held that nervousness cannot be sufficient to support a reasonable suspicion. Rather, the significance of the particular behavior at issue must be determined from the totality of the circumstances on a case-by-case basis.

I disagree with the majority's approach because I think the findings made by the magistrate were based on testimony of the specific behavior exhibited during the stop. That behavior contributes, at least to some degree, toward a finding of reasonable suspicion. The majority asserts (and it is undoubtedly true) that most citizens, whether innocent or guilty, will exhibit some signs of nervousness when confronted by a law enforcement officer. For that reason I agree that it is appropriate to view conclusory testimony that a defendant was "nervous" with a certain degree of caution, lest the officer characterize as suspicious circumstances that describe a very large category of presumably innocent travelers. See Reid v. Georgia, 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980). The unmistakable conclusion of the magistrate, however, was that the nervousness exhibited by the driver and the passenger in this case was excessive under the circumstances and went beyond what people normally show during a routine traffic stop. That conclusion was based upon the officer's testimony—which described specific behavior that could fairly be considered as excessive nervousness. In making this assessment the officer took into account the fact that, in his experience in making approximately five thousand traffic stops, he had seen many persons show signs of anger or slight nervousness. When viewed in the light of what common sense tells us about human behavior, the excessive nervousness shown in this case can rationally be viewed as an indication of possible criminal activity. Cf. United States v. Sharpe, 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985) ("[C]ommon sense and ordinary human experience must govern over rigid criteria.").

The majority finds the district court's reliance upon nervousness particularly troubling because the record contains no evidence that Bushnell "had any prior knowledge of Fernandez or Blanch to make an evaluation of their behavior." This discounting of what the officer observed, in my view, is inconsistent with the maxim that ordinary human experience is to govern over rigid criteria. See Sharpe, supra. If such a circumstance were sufficient to prevent reliance upon nervousness then it would only rarely if ever be appropriate to consider such behavior. Yet, many of our decisions have relied upon signs of nervousness as supporting reasonable suspicion despite the fact that in most if not all of these cases the detaining officer had no prior knowledge of the suspect's mannerisms. See e.g., United States v. Soto, 988 F.2d 1548 (10th Cir.1993) (the defendant's nervous appearance contributed to the reasonable suspicions of the officer); United States v. Bell, 892 F.2d 959, 967 (10th Cir.1989) (defendant became "visibly nervous"); United States v. Walraven, 892 F.2d 972, 975 (10th Cir.1989) (defendant's "nervous mannerisms"). These cases reflect what common sense and experience tell us about human nature: a person who exhibits signs of unusual and excessive nervousness when confronted by a law enforcement officer may be involved in criminal activity.

In assessing the validity of the detention in this case, we must consider "the totality of the circumstances—the whole picture." United States v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). Thus, the significance of the defendant's and the passenger's nervousness must be assessed in light of the erratic driving exhibited earlier by the defendant—not as completely separate factors. Taken together, I think the officer pointed to specific facts that justi-

fied a rational inference that criminal activity was afoot. The circumstances here involved a "series of acts, each of them perhaps innocent" if viewed separately, "but which taken together warranted further investigation." *Terry*, 392 U.S. at 22, 88 S.Ct. at 1881. I also think the officer's legitimate concerns for his safety made it reasonable for him to detain the defendant briefly (for six or seven minutes at most) until backup arrived and then to ask whether there were any guns or drugs in the car. *See Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972) ("A brief stop of an individual, in order to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.") This is particularly true in light of the dangers that police officers face in making traffic stops. *See Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977).

The district court relied upon *United States v. Walraven*, 892 F.2d 972 (10th Cir. 1989), as support for the conclusion that the seizure in this case was reasonable. That reliance was appropriate. In *Walraven*, a deputy sheriff was erroneously informed that the license plate of a car in which the defendant was traveling with another man did not match the vehicle. The deputy turned on his flashing lights and twice gave blasts from his siren but the vehicle failed to pull over. The car traveled on approximately a mile and a half before pulling over, during which time

the two men in the car appeared to be talking and one of them looked back at the deputy. After the car finally stopped, the officer conducted an inquiry and determined that the driver had a valid license and the car was appropriately registered to the defendant. The officer nevertheless detained the defendant for two or three minutes until a backup officer arrived and then proceeded to ask whether there were any guns or drugs were in the car and whether he could search for those items. Based upon the failure to promptly stop the car, the nervous mannerisms of the men in the car, and the officer's law enforcement experience, we concluded that the officer had an objectively reasonable suspicion of criminal activity or a legitimate concern for his safety sufficient to warrant this brief detention.[3] We noted that the officer "sought only to maintain the status quo momentarily before questioning the men in the presence of [a backup officer]." *Id.* at 976. We also observed that the fact that the officer waited a few minutes for his backup to arrive "was nothing more than reasonable police procedure." *Id.* Finally, we concluded that the officer was entitled to request permission to search the vehicle for guns or illegal drugs. *Id.*

The majority distinguishes the instant case from *Walraven* by stating that the defendants in *Walraven* "failed to pull over promptly when the officer activated his overhead lights and siren." Maj.Op. at 879, n. 4.[4] While that statement is accurate, it hardly explains why the investigative detention in

---

3. The *Walraven* opinion does not state explicitly whether the detention was justified by the officer's reasonable belief that the men were committing a crime or by the officer's "perceived threat to his own well-being." *Id.* at 976.

4. In a footnote the majority contends that *Walraven* is distinguishable by other facts as well. The majority states that the suspects in *Walraven* "conferred with one another and actively observed the police officer during the pursuit" and the court notes that such intentional flight is "circumstantial evidence of guilt." This point only underscores the reasonableness of the detention in the instant case. In *Walraven*, although there were no facts pointing specifically to the presence of drugs in the defendants' car, we found that the defendants' failure to stop (together with their nervous mannerisms and the officer's law enforcement experience) gave rise to a reasonable suspicion that the defendants were involved in criminal activity. *See id.* at

975–76. An investigative detention was warranted in *Walraven* because the officer was legitimately concerned with the reason why the men failed to pull over immediately and why they were conferring with each other. Similar concerns were implicated in this case by the defendant's erratic driving and his nervous behavior. The trooper was legitimately concerned with the reason why the defendant drove over into the emergency lane when he saw the trooper and then sped up and pulled back onto the highway when the trooper pulled in behind him.

The majority also states that the officer in *Walraven* "reasonably suspected that the defendants were drug couriers," Maj.Op. at 879, n. 4, although the majority does not explain why it was reasonable for the officer in *Walraven* to have such a suspicion. As in the instant case, there were no facts in *Walraven* pointing specifically to the presence of drugs in the defendants' car. Additionally, the majority fails to mention

*Walraven* was justified but the investigative detention in this case violated the Fourth Amendment. I see no material distinction between the situation confronting the officer in this case and the one confronting the officer in *Walraven*.[5]

In sum, I would find that the officer's brief detention of the defendant for the purpose of asking whether there were firearms or illegal drugs in the car was reasonable and I would affirm the district court.

*Section A—Pretext Stops.*

The majority's ultimate holding in Section A that "we expressly decline to decide" the pretextual stop argument would seem to make any discussion of pretext unnecessary. However, the majority's analysis of the evidence and its conclusion that there is considerable evidence "suggesting that this stop may have been pretextual" appears to me to be based on an expansive view of the pretext doctrine that is at odds with Supreme Court precedent. Moreover, the inclusion of an extended discussion of the pretext issue suggests that it played some role in the resolution of this case. In my view, the magistrate's finding that this stop was not pretextual is supported by the evidence. In *United States v. Deases*, 918 F.2d 118, 121 (10th Cir.1990), we held that a district court's finding that a stop was not pretextual cannot be reversed unless it is found to be clearly erroneous. In light of this standard of review it seems peculiar that the majority feels compelled to assess the evidence and to comment that "it is not a foregone conclusion"

that a reasonable officer would have stopped the defendant's truck. Maj.Op. at 877.

In *United States v. Guzman*, 864 F.2d 1512 (10th Cir.1988), this court indicated that the "arbitrary action" associated with "unfettered police discretion as to whom to stop" for traffic violations "is unreasonable within the meaning of the Fourth Amendment." *Id.* at 1516. The court expressed concern that officers could use some legal justification to stop a person in order to investigate unrelated criminal matters. The court therefore adopted a standard for determining whether a stop is "pretextual" and, consequently, unconstitutional: "a court should ask 'not whether the officer *could* validly have made the stop, but whether under the same circumstances a reasonable officer *would* have made the stop in the absence of the invalid purpose.' "[6] *Id.* at 1517 (emphasis in original). The court emphasized that this standard did not inquire into the actual state of mind of the officer making the stop but "properly preserves the Supreme Court's requirement of an objective inquiry into Fourth Amendment activity." *Id.*

I must frankly confess that I have some difficulty understanding how a court is supposed to determine whether "a reasonable officer would have" made a stop for a particular violation "in the absence of the invalid purpose."[7] Up until now I had at least understood *Guzman* to stand for the proposition that a stop which is supported by probable cause and which is based on some violation that the police have enforced with at

that in *Walraven* the defendants' nervous mannerisms were relied upon by this court to support a finding of reasonable suspicion. The majority does not explain why the nervous mannerisms of the defendants in *Walraven* supported a reasonable suspicion that the defendants were drug couriers but similar behavior is of "limited significance" in this case.

5. The majority's intimation that the district court was somehow confused by cases involving invalid registrations is puzzling. *See* Maj.Op. at 879–80. No such confusion appears in the district court's opinion. In fact, the district court's reliance upon *United States v. Walraven* suggests exactly the opposite. The primary issue addressed by this court in *Walraven* was whether there was a legal basis for the defendant's continued detention *after the trooper confirmed that the defendant's vehicle registration was valid. Id.* at 975. The district court's particular reliance on

*Walraven* thus shows that the court understood perfectly well the nature of the issue before it.

6. This standard was adopted from *United States v. Smith*, 799 F.2d 704 (11th Cir.1986), a case in which the officer who made a stop did not have probable cause to believe that a traffic violation had been committed. *See id.* at 708–09.

7. Common sense suggests that an officer may observe a large number of traffic violations in a given day and must make a choice as to which violators to stop and which ones not to stop. Any number of factors—including legitimate policy considerations—could influence an officer's decision to make a particular stop. How are we to determine when a reasonable officer "would have been uninterested in pursuing the lesser offense" absent a hope of finding a greater offense?

least a modicum of regularity would not be considered pretextual. *See id.* at 1518 ("If police officers in New Mexico are required to and/or do routinely stop most cars they see in which the driver is not wearing his seat belt, then this stop was not unconstitutionally pretextual.... Conversely, if officers rarely stop seat-belt violators absent some other reason to stop the car ... [the stop would be pretextual].") Such is apparently not the case, however, given that the majority's "evidence suggesting this stop may have been pretextual" consists primarily of statistics showing that Trooper Bushnell and other members of his unit regularly issue warnings or citations for violations of the type at issue in this case. The record indicates that this particular unit issued a total of 172 citations and warnings for improperly tinted windows for the five-month period 7/91 to 11/91. Although the specific inference the majority divines from these statistics is unstated, "evidence of pretext" arises, as I understand it, from the fact that Trooper Bushnell has issued "significantly more" warnings during this five-month period than have his fellow officers.[8]

If the *Guzman* standard would require us to view the stop in this case as unconstitutional simply because statistics show that this particular trooper has issued more warnings than other troopers, then I respectfully suggest it may be time to re-examine the pretext doctrine set forth in *Guzman*. Examination of such "evidence of pretext" is in actuality nothing more than an inquiry into Trooper Bushnell's subjective state of mind when he made the decision to stop the defendant in this case.[9] Labeling the statistics relied upon to form this conclusion as "objective evidence" does nothing to alter the subjective nature of the inquiry. I believe this approach conflicts with the Supreme Court's stated view of Fourth Amendment analysis:

Whether a Fourth Amendment violation has occurred "turns on an objective assessment of the officer's action in light of the facts and circumstances confronting him at the time," [cite omitted] and not on the officer's actual state of mind at the time the challenged action was taken.

*Maryland v. Macon,* 472 U.S. 463, 470, 105 S.Ct. 2778, 2783, 86 L.Ed.2d 370 (1985). *See also United States v. Villamonte–Marquez,* 462 U.S. 579, 584 n. 3, 103 S.Ct. 2573, 2577 n. 3, 77 L.Ed.2d 22 (1983) (the fact that customs officers boarding a ship pursuant to statute authorizing a check of the vessel's documentation suspected that the vessel carried marijuana was not a violation of the Fourth Amendment).

The Sixth Circuit recently abandoned the *Guzman* test and joined those circuits holding that so long as the officer has probable cause to believe that a traffic violation has occurred, the resulting stop is not unlawful

---

8. Apparently in order to amplify the differences between Trooper Bushnell and the other troopers in his unit, the majority focuses on the number of warnings previously issued and disregards the number of formal citations issued by the troopers. We recently rejected such an approach when it was asserted by an appellant:

Defendant insists that by the officers' own testimony, the Denver police do not normally issue written tickets in the circumstances present here. But whether the officers would normally issue formal written tickets for such conduct is immaterial. The pertinent issue is whether a reasonable officer would have made the stop for similar conduct, not whether the officer would have issued a formal citation or merely an informal warning.

*United States v. Harris,* 995 F.2d 1004, 1005 (10th Cir.1993).

Also, in addition to its appraisal of various statistics, the majority describes the manner in which Bushnell made the traffic stop in this case and states: "We question whether such a stop would be 'business as usual' for a reasonable officer under the same circumstances." *See* Maj. Op. at 877. Although the specific reason for the majority's disapproval is not spelled out, the fact that the trooper turned around and pursued the defendant's truck for eight or nine miles is apparently contrary to the majority's view of proper law enforcement procedure. It is not clear whether the majority considered the fact that it took the trooper nine miles to overtake the truck because of the rate of speed at which the defendant was traveling.

9. Along these same lines, I am unclear as to the import of footnote two of the majority opinion, especially the comment "we find it interesting that Bushnell could not recall Fernandez's response when Bushnell asked why he pulled into the emergency lane." I do not understand the relevance of this observation. Moreover, the tenor of the remark suggests that this court is engaging in a factual finding concerning Bushnell's credibility—a finding that appears to be at odds with the conclusions of the finder of fact in this case and which is also at odds with the supposedly objective nature of a pretext inquiry.

and does not violate the Fourth Amendment. *United States v. Ferguson,* 8 F.3d 385 (6th Cir.1993) (en banc). *See also United States v. Hawkins,* 811 F.2d 210, 213 (3rd Cir.), *cert. denied,* 484 U.S. 833, 108 S.Ct. 110, 98 L.Ed.2d 69 (1987); *United States v. Rusher,* 966 F.2d 868, 876 (4th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 351, 121 L.Ed.2d 266 (1992); *United States v. Causey,* 834 F.2d 1179, 1184 (5th Cir.1987) (en banc); *United States v. Trigg,* 925 F.2d 1064, 1065 (7th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 428, 116 L.Ed.2d 448, 449 (1991); *United States v. Cummins,* 920 F.2d 498, 501 (8th Cir.1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 428, 116 L.Ed.2d 448, 449 (1992). In so doing the Sixth Circuit opined that *Guzman's* focus on the "objective evidence" of general police practice is in reality "simply an aggregation of the subjective intentions of the officers in the regions." Given the majority's evaluation of the record in this case, I would be inclined to agree that the *Guzman* test has become an inquiry into the officer's subjective state of mind and is inconsistent with the Supreme Court's interpretation of the Fourth Amendment. I see nothing in the record that would justify a conclusion that the stop of the defendant for the traffic violations he committed was an unreasonable seizure. I would affirm the district court.