83 F.3d 434
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 UNITED STATES of America, Plaintiff-Appellee,
v.
James A. GRAVATT, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
George W. TURLEY, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Wiley Keith ABRAM, Defendant-Appellant.
 Nos. 94-3368, 94-3369, 94-3370.
 United States Court of Appeals, Tenth Circuit.
 May 2, 1996.
 
 Before PORFILIO and HOLLOWAY, Circuit Judges, and HOLMES,**
 ORDER AND JUDGMENT*
 HOLLOWAY, Circuit Judge.
 
 
 1
 Defendant-Appellants George W. Turley, James A. Gravatt, and Wiley Keith Abram appeal from their convictions and sentences in the district court. We have jurisdiction pursuant to 28 U.S.C. § 1291. Although filed separately, these appeals (Nos. 94-3368, 94-3369 and 94-3370) are joined for the purpose of their disposition by this order and judgment. Only No. 94-3368, Gravatt, was argued. As to the Turley and Wiley Keith Abram cases, we determined to accept submission by the appellants on the briefs. See Fed. R.App. P. 34(a) and (f) and 10th Cir. R. 34.1.9. A separate order and judgment treats a related appeal, No. 94-3434, by defendant-appellant Sandra K. Abram.
 
 
 2
 * These appeals arise out of a series of alleged insurance fraud schemes involving the appellants in these cases and others. Appellants Turley, Gravatt (Turley's nephew), and Wiley Keith Abram, along with Sandra K. Abram (the wife of Wiley Keith Abram), Ginger E. Tyler (Turley's daughter, a.k.a. Ginger Karleskint), and Kenneth Callahan were charged in a 69-count superseding indictment with various crimes arising out of the alleged schemes: mail fraud and aiding and abetting (18 U.S.C. §§ 1341 and 2); conspiracy (18 U.S.C. § 371); money laundering (18 U.S.C. § 1956(a)(1)(A)(I)); engaging in a monetary transaction in property derived from specified unlawful activity(18 U.S.C. § 1957); failure to file an income tax return (26 U.S.C. § 7203); and making false statements on Internal Revenue Service forms and aiding and abetting (26 U.S.C. § 7206(1) and 18 U.S.C. § 2). I R. doc. 64.
 
 
 3
 At the joint trial of Turley, Wiley Keith Abram, and Gravatt, Ginger Tyler testified for the government. She admitted that she was involved in an insurance fraud scheme, XV R. at 4, and explained generally how the scheme worked. She said that she obtained as many hospital indemnity policies as possible through different associations such as the National Rifle Association. Id. The policies paid anywhere from $30 to 50 or $100 or more for each day the policy holder was hospitalized. Id. at 5. Tyler had 30 or 40 of such policies which would pay her three to four thousand dollars for each day she was hospitalized. Id.
 
 
 4
 Tyler testified that she would then "go wait for something, you know, to get sick or have an accident or, you know, you stage something" such as saying she fell down the stairs or slipped on the ice when she really didn't, or by having someone run into her in her car. Id. at 5-6. After staging an accident, she would go to the emergency room to try to get admitted to the hospital, or she would call her doctor and tell him about the accident and hope that he would admit her. Id. at 6. Since she would be paid for each day she was in the hospital, she tried to prolong her stay as long as possible. Id. She would then file claims with her insurance companies. She admitted at trial that those claims were not truthful. Id.
 
 
 5
 Tyler said that her father, defendant-appellant George Turley, taught her this scheme--how to fill out the form, join the organization and obtain the insurance policies. XV R. at 7. She testified that she was involved in staged accidents with Turley. She and her father "would be in a car and someone that had been paid would be in a different car and run into us." Id. at 8-9. Turley gave her advice about how to make it easier to be admitted to the hospital and to prolong her stay by describing certain symptoms to the attending medical personnel. Id. at 32-36. According to Tyler, Turley had "set other people up" in this scheme. Id. at 36. Turley would receive a third or half of other people's hospital insurance payments. Id. at 147.
 
 
 6
 The government introduced evidence pertaining to four accidents it alleged were staged by or on the behalf of the defendants and others, and a plan to stage another accident in Houston.
 
 July 16, 1988 Accident in Lawrence, Kansas
 
 7
 William Langford, who was serving two sentences, testified that he had known defendant George Turley since 1982 and that he frequently spoke with him by telephone. XI R. at 2, 5-6. He stated that Turley told him he made money by "[d]efrauding insurance companies." Id. at 6. Langford said that he would sometimes help set up phony wrecks for Turley: "I would find an inmate that I knew in the prison and ask him if they had anybody on the street that would be willing to have a car wreck for a certain amount of money, usually $2,000." Id. at 7. Langford testified that Turley told him that he made money from these car wrecks "by going into the hospital and he had these numerous insurance policies that paid him so many--so much every day he was in the hospital. And however long he stayed, that's how much he got paid." Id. According to Langford, Turley made almost $6,000 a day for each day in the hospital. Id. at 7-8.
 
 
 8
 The first collision Langford helped Turley arrange involved Larry Lane, a fellow inmate, and his wife Claudia Lane. XI R. at 8. Langford gave Turley's phone number to Larry Lane and told him to have his wife get in a wreck that would be her fault. He told Larry Lane that Claudia would get $1,000 for the wreck. Id. Turley told him that the wreck had happened. Claudia Lane testified that while visiting her husband in prison he asked her if she "was interested in being involved in a car accident." XV R. at 244-45. Her husband told her that she could make $1,000. A week or two later her husband gave her a phone number to call. Id. at 245-46. Ms. Lane testified that she "[w]ent to a pay phone and called that number, because I didn't have a phone at home, and asked to speak to George Turley. And someone got on the phone and I told him I was Claudia, Larry's wife." Id. at 246. During that phone conversation, Ms. Lane and Turley arranged to meet at 23rd and Ridge Court in Lawrence, Kansas. She said that she was to look for a red sports car. Id. at 246-47.
 
 
 9
 On July 16, 1988, Ms. Lane went to the location around seven in the evening and saw the red sports car. Id. at 247, 252. She got out of her car and went over to the sports car, in which there was a white man and young woman. Ms. Lane said that she went up to the passenger side to talk to the people and that they "discussed that there would be a van coming down, a dark brown van and I would know the van because the lights would blink, that would tell me that that's the van. I was supposed to hit the van and I got ten $100 bills." Id. at 248-49. Ms. Lane said:
 
 
 10
 Then I left and got back in my car and I went to where I was supposed to hit the car. I went up Ridge court, on Ridge Court Street and set there for a little while till I could see the van coming. Then I could see the lights blinked and I pulled out. There's a stop sign there and I got to the stop sign and as the van was coming toward me I ran out and hit the van.
 
 
 11
 XV R. at 250. Ms. Lane then got out of her car. The police came and she told them that her brakes had gone out. She never heard from Turley after the accident.
 
 
 12
 Lawrence Lane testified that he saw Turley in the prison visitors' room not long after the accident. Turley told him that his wife had done "a good job" and he "appreciated it." Turley told Lane that he would send him some money and Lane later received a $100 money order. Id. at 312-14.
 
 
 13
 September 2, 1989 Accident in Joplin, Missouri
 
 
 14
 Ginger Tyler testified that she was involved in a staged car accident on September 2, 1989, with her father (defendant Turley), Eddie Cox and Cox's girlfriend Wilhelmina. Tyler said: "my dad wanted to have a wreck out of town" because "there was a policy, I think it was United Equitable, that would pay double--either double or triple, I can't remember now, but I think it was double, if you're involved in a car wreck over a hundred miles away from home it will pay you double for every day you're in the hospital. And it was $100 a day, so it would be $200." XV R. at 73-74. Tyler had a conversation with her father about a month before the accident in which her father first told her about the idea of going out of town for an accident. Id. at 74-75.
 
 
 15
 Turley contacted Tyler a week or a couple of days before the accident and told her she would have to pay him a thousand or $1,500, which was "half of what he paid the driver of the other car." Id. at 75-76. Her understanding was that this money would go to pay the driver of the other car. Turley told her that the accident would be in Joplin. Id. at 76. Tyler testified that on September 2 on the way to Joplin, Turley discussed the accident with her. The accident was staged in Joplin where Wilhelmina came up over a hill and smashed into their car. Tyler said that her father then got out of the car and went back to talk to Wilhelmina. Turley did not appear to be injured. XV R. at 80-82.
 
 
 16
 In the emergency room of the hospital, Tyler heard her father complain about his back. She admitted that she lied to the doctor in order to get admitted to the hospital, but she was not admitted. Id. at 84. On the ride home her father commented that she "didn't do it right," meaning that she "didn't play it up enough" or "played it up too much to where [she] looked like [she] was faking it." Id. 85-86.
 
 
 17
 Later that day, after returning to Kansas City, Tyler went to her father's house. Turley told his daughter that the Abrams were going to drive them to the hospital. Tyler and her father were admitted to the hospital and "went straight to our rooms and started getting pain shots." Id. at 99. They were both hospitalized for seventeen days. Id. at 100. Tyler testified that she filed claims on her insurance policies, and that the companies paid her $100,000. She received those payments in the form of checks which were sent through the mail. Id. at 101-02.
 
 
 18
 Kathy Sue Rhoads, a third-party administrator[1] with Kirke-Van Orsdel, Inc., testified about certain insurance claims to which were attached copies of the payment checks made on those claims. See XXIII R. at 939. Among the claims that Miss Rhoads testified about was government exhibit 762, a claim for hospital confinement from September 2 to September 19, 1989 payable to George Turley. Id. at 942. The benefit payment check for that claim was sent through the mail. Id. at 943. According to the accident report accompanying that claim, the accident occurred on September 2, 1989 in Joplin, Missouri, Ginger Karleskint (Tyler) was the driver of one of the vehicles and George Turley was a passenger in that vehicle. Id. at 946-47.
 
 
 19
 September 21, 1989 Accident in Kansas City, Missouri
 
 
 20
 Jill Turley testified that Wiley Keith Abram made statements to her about a car accident in Kansas City, Kansas, in which he was a passenger. XII R. at 242-43. She said Abram told her that the driver of the car "kept driving around the block numerous times and finally Keith [Abram] had to tell him to slam on his brakes so the automobile behind them could hit them." Id. at 243. A copy of a police report from the Kansas City, Missouri Police Department, attached to an insurance claim form, indicated that there was an accident on September 21, 1989, involving a brown 1980 Chevrolet van driven by James Gravatt, in which Keith and Sandra Abram were passengers. XVI R. at 408.
 
 
 21
 Ginger Tyler testified that she got out of the hospital on September 19, 1989 and that James Gravatt was admitted shortly after that. When she visited Gravatt in the hospital, he did not appear or act injured or in pain. However, when the nurse came in he "went into his pain mode." XV R. at 50-52. Ms. Tyler stated that her father, George Turley, had talked to her about accidents Mr. Gravatt had had. She said Mr. Gravatt always used his van rather than his Corvette.
 
 
 22
 Evidence was introduced which showed that Keith Abram and James Gravatt received insurance payments for hospitalization arising out of this accident. XXII R. at 655-58; XXIII R. at 869-70; 948-49; 952-53.
 
 
 23
 November 30, 1990 Accident in Bonner Springs, Kansas
 
 
 24
 William Langford testified that he helped set up an accident involving David Ridens. Langford had asked Randy, David Ridens's brother and Langford's fellow prisoner, if he knew anyone that would be willing to have a wreck. Randy put Langford on the phone with his brother David. XI R. at 11-13. Langford gave Dave Ridens Turley's number and Ridens called Turley on a three-way call. A recorder picked up, and Langford left a coded message and Dave Ridens's number. Id. at 13. Langford testified that he later spoke to Turley on the phone and Turley told him that a deal had been set up. Id.
 
 
 25
 Laura Jill Turley, Turley's ex-wife, testified that she was familiar with the Bonner Springs accident. XI R. at 161. Id. at 161. Mr. Turley told her that the accident had occurred in front of McDonald's, and that he gave Ridens $2,000 in cash. Id. at 162. Mr. Turley went in the hospital either that night or the next day. Id. at 163.
 
 
 26
 Dave Ridens testified that he spoke by phone with George Turley about staging an accident. XXIII R. at 905. They arranged to meet in DeSoto, Kansas. During that meeting, Turley said that he wanted to stage an accident and would pay Ridens $2,000. Id. at 906-07. Ridens, driving an 1983 Ford Escort, hit Turley's 1986 Ferrari from the rear. Turley paid him $2,000. Id. at 910, 912, 917.
 
 The Plan to Stage an Accident in Houston
 
 27
 Cathy Ward testified that she spoke to William Langford on the phone in late spring or early summer 1991, while she was living in Houston. She said Langford gave her George Turley's number and told her to call him. XVI R. at 272-75. Ms. Ward later called the number Langford gave her and a woman answered. Ms. Ward asked to speak to George Turley. Id. at 276. Turley told her that he wanted to stage an accident and that he would pay her $2,000. Turley indicated that he would be driving a rental car. Id. at 277-79.
 
 
 28
 Jill Turley testified that she purchased a money order to send to Cathy Ward in Houston. XI R. at 198. She stated that she was intending to go to Houston to have an accident with Cathy Ward. Mrs. Turley discussed this accident with Turley and Mr. Abram. Id. at 202. Mr. Turley said that they were to send $400 to Cathy Ward for her to get car insurance. He indicated that they were going to fly to Houston and he made arrangements through a travel agency. Id. at 203-04. Mrs. Turley said that they did not take the trip to Houston because Cathy Ward could not do it at that time. Id. at 205. Ms. Ward testified that Mr. Turley offered her more money, but she did not intend to stage a car accident. XVI R. at 285.
 
 
 29
 Turley, Wiley Keith Abram and Gravatt were tried jointly and received multiple convictions.[1]
 
 II
 No. 94-3368--United States v. Gravatt
 A. Denial of Severance
 
 30
 Gravatt first argues that the district judge erred in denying his motion to sever. We review the denial of a motion to sever for abuse of discretion. United States v. Wacker, 72 F.2d 1453, 1467 (10th Cir.1995).
 
 
 31
 In ruling on a severance motion, "the district court has a duty to weigh the prejudice resulting from a joint trial of co-defendants against the expense and inconvenience of separate trials." United States v. Hack, 782 F.2d 862, 870 (10th Cir.), cert. denied sub nom. Owens v. United States, 476 U.S. 1184 (1986). For a defendant to show that denial of severance was an abuse of discretion he must show "actual prejudice to him resulting from a denial of his request for severance." Id. See also United States v. Scott, 37 F.3d 1564, 1579 (10th Cir.1994) ("[i]n this circuit, the general rule is to try persons jointly indicted together, and we will not reverse the lower court's decision absent a strong showing of prejudice" (quoting United States v. Wright, 932 F.2d 868, 878 (10th Cir.), cert. denied, 502 U.S. 962 (1991)), cert. denied sub nom. Skinner v. United States, 115 S.Ct. 773 (1995), Caldwell v. United States, 115 S.Ct. 1323 (1995), Yung v. United States, 115 S.Ct. 1324 (1995). "Prejudice occurs when there is a serious risk that a joint trial [will] compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence." United States v. Edwards, 69 F.3d 419, 434 (10th Cir.1995) (internal quotation marks and citations omitted), petitions for cert. filed, 64 U.S.L.W. 3593 (Feb. 23, 1996) (No. 95-1355), (Feb. 29, 1996) (No. 95-8147), (Mar. 4, 1996) (No. 94-8134). "Neither a mere allegation that defendant would have a better chance of acquittal in a separate trial, ..., nor a complaint of the 'spillover effect' from the evidence that was overwhelming or more damaging against the co-defendant than that against the moving party is sufficient to warrant severance." Hack, 782 F.2d at 870. Accord United States v. Cardall, 885 F.2d 656, 668 (10th Cir.1989). Prejudice is not shown by a hypothesis of prejudice. Wacker, 72 F.3d at 1468.
 
 
 32
 Before trial Gravatt moved to sever his trial from that of defendant Turley "anticipating that the overwhelming litany of admissible prior acts evidence linking Turley to felonious schemes would create an inappropriate inference of his own guilt with the trier of facts." Brief of Appellant at 9-10. The trial court rejected this claim as a "spillover effect" argument. Gravatt concedes that the trial court's ruling was based on governing Tenth Circuit precedent, but argues that the application of that law to his case "impermissibly subordinates the consideration of the fairness of proceedings against him to the concerns of law." Id. at 10.
 
 
 33
 Gravatt's contentions essentially amounted to a claim that evidence of Turley's fraudulent conduct spilled over to him. However Gravatt has pointed to nothing in the trial record to show "actual prejudice to him resulting from a denial of his request for severance." Hack, 782 F.2d at 870. Therefore the denial of his motion to sever was not an abuse of discretion.
 
 B. The Surprise Witness
 
 34
 Gravatt next claims that the district court abused its discretion in admitting the testimony of Alice Winney, Gravatt's former girlfriend. Winney was not on the government's witness list and Gravatt argues that he was prejudiced by the district court's decision to allow her to testify over his objection. We review the admission of testimony from an unlisted government witness for abuse of discretion. United States v. Sturmoski, 971 F.2d 452, 458 (10th Cir.1992). To prevail Gravatt must show that he suffered unfair prejudice from the use of Winney's testimony. See id.
 
 
 35
 The government filed its witness list on March 7, 1994. Winney was not on that list. The trial commenced on March 14. On March 30, the government filed a supplemental witness list which listed Winney. Counsel for Gravatt objected to the government's intention to call Winney, noting that he had only found out about Winney "yesterday" (March 29, 1994). XXIV R. at 1192. However, the prosecution noted that it was unaware until March 28 that Winney had any knowledge of any fraudulent activity, a fact corroborated by Winney's April 4, 1994 testimony that she was first contacted by federal agents "Monday of last week [March 28, 1994]." Id. at 1201; XVII R. at 617.
 
 
 36
 Winney testified on March 31, 1994, and Gravatt again objected to her testimony. The direct examination concluded that same day. The judge agreed to Gravatt's request to defer cross-examination to April 4. XVII R. at 601, 603. Gravatt's counsel thus had three days to prepare to cross-examine Winney. He did not ask for a mistrial or for a continuance to allow more investigation or preparation.
 
 
 37
 Gravatt asserts that "key tactical decisions previously made and followed during the course of the Government's case-in-chief--and even his decision to stand trial and contest the charges against him in lieu of accepting any alternative disposition--were based upon reciprocal disclosure of anticipated evidence exchanged by the parties prior trial." Id. at 18. He claims "prejudice impacting his evaluation of the case against him and his formulation of trial strategy arising from the lack of advance reciprocal disclosure of Winney," basing his claim on the position that "[h]is entire defense was premised upon the prosecution's inability to sustain a showing of his guilt beyond a reasonable doubt." Id.
 
 
 38
 Gravatt relies on United States v. Talbot, 51 F.3d 183, 187-88 (9th Cir.1995). In Talbot the district court ordered the government to file, pursuant to a local rule, a pretrial witness list. Id. at 187. The court reiterated the request at a pretrial conference. Despite the court's order and request, the government did not name its witnesses until several weeks after pretrial papers were filed. Id. The district court excluded one of the government's witnesses. The Ninth Circuit upheld the exclusion, concluding that it did not amount to an abuse of discretion. The court noted that the government "offer[ed] no excuse for its delay" and that "a violation of a 'specific discovery order' ha[d] been demonstrated." Id. at 187-88.
 
 
 39
 Talbot is distinguishable. Here the government was justified in not knowing of Winney's importance until March 28, 1994. The day after the government learned that she possessed important information, Gravatt's counsel was informed. The following day the government filed its supplemental witness list. And, as Gravatt's counsel concedes, there was no malice or willfulness underlying the government's failure to disclose Winney in its original witness list. Here we feel that, unlike Talbot, the delay in endorsing Winney was excusable. We hold that Gravatt has failed to show unfair prejudice resulting from the admission of Winney's testimony, particularly in light of the court's allowing substantial time for Gravatt to prepare to cross-examine Winney. Therefore, the district court did not abuse its discretion.[2]
 
 C. Sentencing--Amount of Loss Calculated
 
 40
 Finally, Gravatt claims that an erroneous calculation in his Presentence Report may have increased his offense level by one point which, in turn, may have increased his term of incarceration by 6 months. In reviewing a trial court's application of the sentencing guidelines, we review questions of law de novo and accept all findings of fact unless clearly erroneous. United States v. Short, 947 F.2d 1445, 1456-57 (10th Cir.1991), cert. denied, 503 U.S. 989 (1992). The government contends that Gravatt did not raise this issue below, and therefore argues that the plain error standard applies. Regardless of the standard of review, however, there is no merit to Gravatt's position.
 
 
 41
 Gravatt says that certain losses attributed to him may have been improperly counted twice in the Presentence Report. There does appear to be an inconsistency between p 117 and p 122.[3] Paragraph 117 appears to cover the total loss attributable to Gravatt for hospitalizations in which he was hospitalized and was a policyholder. This would cover both the Kansas City and Lawrence accidents but would not cover the relevant conduct of Wiley Keith and Sandra Abram also attributable to Gravatt. Assuming Gravatt is correct that the $155,968 total referred to in p 117 was the total amount of loss attributable to his hospitalizations during 1988-1990 ($26,100 in 1988, $62,890 in 1989, and $66,978 in 1990, all paid to Gravatt per p 117 equals $155,968) rather than the loss attributable only to his hospitalizations arising out of the Lawrence accident, as p 122 might be read to suggest, the total loss would be calculated as follows: $155,968.00 (total loss attributable to Gravatt's hospitalizations) plus $23,205.00 (loss from Wiley Keith and Sandra Abram stemming from Lawrence accident) plus $51,260.00 (loss from Wiley Keith and Sandra Abram stemming from Kansas City accident) for a total loss of $230,433.00. This total is the same as the resulting "total loss of $230,433" stated in line 6 of p 122.
 
 
 42
 Thus, although the calculation set forth in p 122 appears at first glance to double count the losses attributable to Gravatt's hospitalization stemming from the Kansas City accident, (as noted above, both Gravatt and Keith Abram received insurance payments for hospitalization arising out of the Kansas City accident), the final result reached in p 122 is the same as that which would be calculated if Gravatt is correct that the $155,968 is the total amount attributable to his hospitalizations. "Relevant conduct" as to defendant Gravatt also includes checks totaling $23,205 and $51,260 paid to the Abrams for the Lawrence and Kansas City accidents as p 118 and p 120 of the Presentence Report explain. See United States v. Fox, 999 F.2d 483, 485-86 (10th Cir.1993). Thus no prejudicial error in the Presentence Report calculations for his sentence is demonstrated by Gravatt.
 
 
 43
 No. 94-3370--United States v. Wiley Keith Abram
 
 A. Jury Instructions
 
 44
 Abram first argues that the trial court erred in refusing to give a number of his requested jury instructions. "The refusal to give a particular jury instruction, even if the instruction is an accurate statement of the law, is within the sound discretion of the district judge." United States v. Vasquez, 985 F.2d 491, 496 (10th Cir.1993). "With respect to tendered jury instructions which were refused, 'so long as the charge as a whole adequately states the law, the refusal to give a particular requested instruction is not an abuse of discretion.' " United States v. Levine, 41 F.3d 607, 615 (10th Cir.1994) (quoting United States v. Suntar Roofing, Inc., 897 F.2d 469, 473 (10th Cir.1989)).
 
 
 45
 We have examined the instructions which defendant Wiley Keith Abram says he requested and were improperly refused. First, he cites an instruction that would have required proof by the government that the insurance policies specifically excluded claims for intentionally self-inflicted injuries. The government responded that what it had to prove was that the defendant submitted claims under the policies knowing that he would not receive payments if the insurance companies knew a collision was a staged accident. We agree with the government that Abram's requested instruction misstated the law. The proof of the government on staged accidents and the multiple claims for payments submitted came within the broad terms of the mail fraud statute, 18 U.S.C. § 1341, which proscribes, inter alia, schemes or artifices to defraud, etc., by use of the mail. See Instruction 18. Proof to support the indictment's charge, for example, that Turley and Ginger Tyler knew that the September 2, 1989, collision in Joplin, Missouri, "was not a true accident but was instead a planned and intentional collision" (Count 8, p 4) was adequate. We have considered the additional claims of omissions and errors in the jury instructions asserted by Mr. Abram.[4] We are satisfied that the charge given adequately covered all these matters.
 
 B. Turley's Cross-Examination of Langford
 
 46
 Abram claims that the trial judge erred by admitting prejudicial hearsay which allegedly suggested that Abram had threatened the mother of William Langford, a government witness. We review the admission of evidence generally for abuse of discretion, giving special deference to the trial judge's decisions on hearsay. United States v. Tome, 61 F.3d 1446, 1449 (10th Cir.1995).
 
 
 47
 During the course of the trial, defendant George Turley recalled William Langford, the inmate who had previously been a prosecution witness. Turley's counsel examined Langford about a letter he wrote to Turley. The following exchange occurred:
 
 
 48
 Q. And then is it true that--or do you remember saying, "I figure I've got about 14 more years to do on the murder change now that I tried to get all the witnesses killed on it. How about we split it down the middle? You do seven and I'll do seven."
 
 
 49
 Do you remember making this statement?
 
 
 50
 A. Vaguely, yes.
 
 
 51
 Q. And you made that statement because you were mad at Mr. Turley because you didn't end up getting the attorney?
 
 
 52
 A. I made that statement because he had been harassing my mother. This whole letter was wrote after I'd made a phone call to my mother and she answered it, she was crying--
 
 
 53
 MR. WOOD [counsel for Mr. Abram]: Judge, it may not be--I object to him talking about something his mother did as hearsay.
 
 
 54
 THE COURT: I don't think the fact that she's crying is hearsay. It's not hearsay.
 
 
 55
 MR. WOOD: I ask any statements he might have been about to make be hearsay.
 
 
 56
 Q. (By Mr. Rauzi [counsel for Turley]: You're saying your mother was upset with Mr. Turley.
 
 
 57
 A. Yes.
 
 
 58
 Q. Very upset?
 
 
 59
 A. Well, she didn't know what was going on. And he had Keith calling her.
 
 
 60
 MR. RAUZI: I object to that, Judge.
 
 
 61
 MR. WOOD: Judge, I'm going to object and ask that be stricken. There's no foundation, it's improper and it's hearsay.
 
 
 62
 THE COURT: Overruled.
 
 
 63
 XII R. at 426-27 (emphasis added).
 
 
 64
 Langford's statement "Well, she didn't know what was going on. And he had Keith calling her" was made during cross-examination by Turley's counsel. However, the statement was obviously not expected nor elicited by Turley's counsel, as indicated by his objection to Langford's response to his question. Though the trial judge should have perhaps stricken the statement, we do not believe that the statement was so prejudicial to Abram that it would have affected the outcome of the trial. It was not necessarily clear that the statement meant that Abram was threatening Langford's mother. Therefore, we reject Abram's claim that admitting this statement was reversible error. Abram also argues that the admission of this statement violated the Confrontation Clause. For the reason already given, we reject this contention because any error on this point was harmless beyond a reasonable doubt.
 
 
 65
 C. Motion for New Trial based on Jill Turley's Alleged Perjury
 
 
 66
 Abram claims that Jill Turley lied on the witness stand, specifically that when she was asked if there was a warrant for her arrest in Tennessee she answered no. See XII R. at 284. Abram asserts therefore that his convictions are based on perjurious testimony and thus violate due process. Brief of Appellant at 15-17.
 
 
 67
 Abram's claim fails because there is no reliable evidence in the record to establish the alleged perjury by Jill Turley or to even raise sufficient doubt so as to warrant a hearing on the matter. The only evidence that there was an outstanding warrant for Jill Turley's arrest was the following: notes (dated 7/12/93-7/15/93 and 7/19/93) from the Johnson City (Tennessee) Police Department which refer to contact with the IRS regarding Ms. Turley; a copy of an appearance/property bond for Laura Turley from the City of Johnson City, Washington County, Tennessee (dated July 14, 1994); and affidavit of complaint, No. 93-30597, State of Tennessee v. Laura Turley, in the Municipal Court of Johnson City (dated June 18, 1993); a personal history sheet on Laura Turley from the Johnson City Police Department Bureau of Criminal Investigation (dated 7/14/93); and a letter dated August 4, 1994 from George Turley to the Clerk of the Municipal Court of Johnson City bearing a stamp reading "JOHNSON CITY POLICE DEPT." and a handwritten note reading "She failed To Appear In Session [illegible] CAPIAS ISSUED." Although this handwritten note was signed, the signature is illegible, there is no indication of the position or office held by the person signing the note, and the note was not dated. VI R. doc 536, Attachments to Supplemental Motion for New Trial.
 
 
 68
 None of this evidence indicates with any degree of reliability that there was in fact an outstanding warrant. Therefore, the district court did not abuse its discretion in denying Mr. Abram's motions for a new trial.
 
 D. Motion to Sever
 
 69
 Finally, Abram argues that the district court erred in denying his motion to sever his trial from the trial of George Turley. He asserts the same argument that appellant Gravatt did, see above, namely, that so much evidence of wrongdoing was admitted against Turley that it prejudiced Abram's right to a fair trial. This claim, as based on "spillover" effect, is unconvincing in light of United States v. Hack and United States v. Cardall, supra. Therefore it was not an abuse of discretion to deny Abram's motion to sever.[5]
 
 No. 94-3369--United States v. Turley
 
 70
 Turley is proceeding pro se on appeal and has filed both an opening and reply brief. We liberally construe pro se briefs; however, "an appellant's pro se status does not excuse the obligation of any litigant to comply with the fundamental requirements of the Federal Rules of ... Appellate Procedure." Ogden v. San Juan County, 32 F.3d 452, 455 (10th Cir.1994), cert. denied, 115 S.Ct. 750 (1995).
 
 A. The Search of Turley's Residence
 
 71
 Turley raises several issues related to the search and seizure of items from his residence on October 16, 1991. In reviewing Fourth Amendment claims we review de novo the ultimate question of Fourth Amendment reasonableness, but review findings of fact only for clear error. United States v. Fernandez, 18 F.3d 874, 876 (10th Cir.1994).
 
 1. Execution of the Warrant
 
 72
 Turley first argues that government agents executed the search warrant for his house in violation of Fed.R.Crim.P. 41(c)(1) which requires that a "warrant shall be served in the daytime, unless the issuing authority, by appropriate provision in the warrant, and for reasonable cause shown, authorizes its execution at times other than daytime." "Daytime" is defined as "the hours from 6:00 a.m. to 10:00 p.m. according to local time." Fed.R.Crim.P. 41(h). He says the warrant was executed at 5:45 a.m. in violation of the daytime requirement and that therefore suppression is warranted. Turley did not raise this in his original suppression motion, I R. doc. 120, instead raising it in a motion to suppress filed a few weeks prior to trial, IV R. doc. 329, and after the district judge had denied his original motion to suppress, III R. doc. 227.
 
 
 73
 At the suppression hearing on Turley's original motion to suppress, IRS Agent Reed testified that members of the Overland Park Police Department "effected the entry and arrested Mr. Turley. We arrived just after they declared the residence secure, at approximately 6:10 a.m." XVIII R. at 112. This was the only testimony presented regarding the entry of the Turley residence. The district judge found that "[a]t approximately 6:10 a.m. on October 16, 1991, a search of defendant Turley's residence at 1616 Lakestone Drive was commenced." III R. doc. 227 at 2. In light of Agent Reed's testimony, this finding is not clearly erroneous, and therefore we reject Turley's argument that the search violated Fed.R.Crim.P. 41(c).
 
 
 74
 Next, Turley claims that the search violated the "knock-and-announce" requirement of 18 U.S.C. § 3109.[6] This argument also was made only in Turley's second motion to suppress. " 'If the record clearly establishes the defendant['s] contention that the executing officers failed to announce their authority and purpose before forcibly entering the dwelling, and that no exigent circumstances were shown, the evidence must be suppressed as the fruit of an unlawful search.' " United States v. Peveto, 881 F.2d 844, 850 (10th Cir.) (quoting United States v. Ruminer, 786 F.2d 381, 383 (10th Cir.1986)), cert. denied sub nom. Hines v. United States, 493 U.S. 943 (1989). "There is a presumption of government propriety, however, and the defendant bears the burden to establish a prima facie case by putting on some evidence that § 3109 has been violated." Peveto, 881 F.2d at 850-51. Turley has failed to meet his burden. He points to nothing in the record, and we have found nothing, to indicate that the authorities executing the warrant did not comply with the "knock-and-announce" requirement. Therefore, we reject his claim that the search violated 18 U.S.C. § 3109.
 
 2. Probable Cause to Support the Warrant
 
 75
 In his original motion to suppress, Turley argued that the search was without probable cause. He did not challenge specific statements in the search warrant affidavit. See I R. doc. 120. At the hearing on this motion to suppress, Turley called no witnesses, and instead rested on his motion. XVIII R. doc. 626 at 108. The government presented the testimony of IRS Agent Reed. The district judge concluded that Turley "failed to demonstrate that the warrant lacked a substantial basis," and that "the affidavit attached to the search warrant is sufficient to establish probable cause for the search." III R. doc. 227, Memorandum and Order (August 12, 1993), at 6.
 
 
 76
 In his motion to suppress filed March 2, 1994, Turley asserted that statements in the search warrant affidavit "were incorrect, stale, and/or misstatements of what the informants actually said" and that these statements were included in the search warrant in reckless disregard of the truth. IV R. doc. 329 at 9. In addition he claimed that material information which would have altered the issuing judge's probable cause determination was omitted from the affidavit. He argues, therefore, that there was no probable cause for the search warrant.
 
 
 77
 At a hearing on March 11, 1994, the district court said:
 
 
 78
 We'll turn next to the motion of the defendant Turley to suppress evidence. That's document 329. And this--it appears to the Court to be a motion asking me to reconsider my order which previously denied a similar motion to suppress. I'm not going to receive any evidence in connection with this later motion. We heard evidence in connection with the first motion to suppress, file document 120, I have granted and considered the motion and the Government's response and I have stated I conclude that no hearing is required to resolve the motion, no further argument is necessary. And for the very same reasons stated in my memorandum and order dated August 12, 1994, which is file document 231[sic],[7] the motion to suppress continues to be denied.
 
 
 79
 XIX R. at 47-48.
 
 
 80
 On appeal Turley reasserts his challenge to the search warrant affidavit. However, he does not challenge the district court's refusal to hear additional evidence on his second motion to suppress. Therefore, we will rely on the only evidence available to us--the transcript of the hearing on Turley's original motion to suppress.
 
 
 81
 A "defendant has the burden of proving that a warrant was invalidly issued in reliance on a deliberately or recklessly false affidavit." United States v. Maestas, 2 F.3d 1485, 1491 (10th Cir.1993) (citing Franks v. Delaware, 438 U.S. 154, 171-72 (1978)). "At the hearing the defendant must establish knowing or reckless falsity by a preponderance of the evidence before he may obtain suppression of the evidence obtained from the search." United States v. Corral-Corral, 899 F.2d 927, 933 (10th Cir.1990) (citing Franks, 438 U.S. at 171). The record contains no evidence indicating that there were any false statements by the affiant. Because there is no such evidence, there are no grounds for us to reject any of the information contained in the search warrant affidavit. We have independently reviewed the affidavit and conclude that it established probable cause. Therefore, the search warrant was valid.
 
 3. Scope of the Search
 
 82
 Turley next asserts that many items seized were beyond the scope of the warrant. In his original motion to suppress he argued that the search authorized the seizure only of those items specified in Exhibit A to the search warrant, see I R. doc. 120, Exhibit A, but that the "officers and agents who executed the warrant conducted a general exploratory search of the premises and seized property that was not described either in the warrant or the supporting affidavit." Id. at 1. Turley specifically challenged the seizure of a number of items listed in the Return and Inventory. See id.
 
 
 83
 The district court concluded that the only items seized that might have been beyond the scope of the warrant were (1) a silver place setting and (2) ceiling fans and door knobs. III R. doc. 227 at 5. At the suppression hearing, IRS Agent Reed testified that he authorized the seizure of the silver place setting because he "believed it to be reasonably related to jewelry, which was specifically listed or an item at least of that same type." XVIII R. doc. 626 at 117. He also testified that the ceiling fans and doorknobs were seized because Detective Beach of the Overland Park Police Department said those were stolen property and should be seized. Id. at 120.
 
 
 84
 As to the silver place setting, the judge concluded "that the seizure of the silver set was arguably within the scope of the search warrant." Id. The warrant authorized the seizure of jewelry, and the court concluded that "even though the term jewelry does not precisely cover silver place settings, ... an officer reasonably could have believed the place setting to be covered by the warrant." Id. As for the ceiling fans and door knobs, the court concluded that those items were lawfully seized pursuant to the plain view doctrine. Id. at 6.
 
 
 85
 In his second motion to suppress the evidence seized from his house and in the brief for this appeal, Turley lists many items in addition to those specified in his original motion to suppress. We do not address his claim that these additional seized items were beyond the scope of the warrant because, as previously noted, Turley does not challenge the judge's decision not to take additional evidence or to reconsider his denial of the first motion to suppress.
 
 
 86
 "[T]he Fourth Amendment mandates that search warrants 'particularly describ[e] the place to be searched and the persons or things to be seized.' " United States v. Medlin, 842 F.2d 1194, 1199 (10th Cir.1988) (quoting Marron v. United States, 275 U.S. 192, 196 (1927). "As a general rule, 'only the improperly seized evidence, not all of the evidence, must be suppressed, unless there was a flagrant disregard for the terms of the warrant.' " United States v. $149,442.43 in United States Currency, 965 F.2d 868, 875 (10th Cir.1992) (quoting United States v. Medlin, 798 F.2d 407, 411 (10th Cir.1986)). However, "[w]hen law enforcement officers grossly exceed the scope of a search warrant in seizing property, the particularity requirement is undermined and a valid warrant is transformed into a general warrant thereby requiring suppression of all evidence seized under that warrant." Medlin, 842 F.2d at 1199.
 
 
 87
 We have examined the record and agree with the district judge's conclusion that only the silver place setting and the ceiling fans and door knobs might have fallen outside the warrant. In addition, we agree with the district court's conclusion that the ceiling fans and doorknobs were lawfully seized under the plain view doctrine.
 
 
 88
 "[W]here the government has a warrant to search a given area for specific objects, and in the course of the search come[s] across some other article of incriminating character, the plain view doctrine may permit the government to seize the evidence without a warrant." United States v. Janus Industries, 48 F.3d 1548, 1554 (10th Cir.), cert. denied, 116 S.Ct. 87 (1995). To justify a seizure based on the plain view exception to the warrant requirement, the government must satisfy three conditions: (1) the seizing agent must not have violated the Fourth Amendment in arriving at the place where the evidence was in plain view; (2) the item to be seized must not only be in plain sight, but its incriminating character must be immediately apparent; (3) the officer must not only be lawfully located in a place from which the object can be plainly seen, but must also have a lawful right of access to the object itself. Id. at 1554-55 (citing Horton v. California, 496 U.S. 128, 136-37 (1990)). These conditions have been satisfied here. The agents were lawfully in the master bedroom of Turley's residence pursuant to the search warrant. The boxes which contained the ceiling fans and doorknobs were clearly marked on the outside as being ceiling fans and door knobs and as bearing the name on the individual who had constructed the house. XVIII R. doc. 626 at 118. Detective Beach was present and knew that these items had been reported stolen. Id. Thus, their incriminating character was immediately apparent. And because the boxes were clearly marked, the agents had the authority to seize the items contained inside. Therefore, the seizure of the doorknobs and ceiling fans did not violate the Fourth Amendment.
 
 
 89
 We need not decide whether the seizure of the silver place setting violated the Fourth Amendment, because we conclude that even assuming it did, (1) the seizure of one item beyond the scope of the warrant did not convert the search into a general search prohibited by the Fourth Amendment, and (2) in light of the overwhelming evidence of Turley's guilt, the error would be harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18 (1967).
 
 4. Jill Turley's Consent to Search
 
 90
 Turley asserts that after October 16, 1991, the date of the search, government agents searched his house without obtaining his consent. He asserts that on October 17, 1991, Jill Turley, then his wife, executed a consent to search. He claims, however, that Mrs. Turley could not give consent to search. The government claims that Turley has not shown that any evidence seized pursuant to the consent search was used in the prosecution of the instant case. We agree. Turley has pointed to no evidence admitted against him at trial that was the product of the consent search. Therefore, there is nothing to suppress and any violations of the Fourth Amendment occasioned by the consent search are harmless beyond a reasonable doubt.
 
 B. Rule 404(b) Evidence
 
 91
 Turley next argues that the district court erred by allowing the introduction of evidence pursuant to Fed.R.Evid. 404(b). We review the decision to admit 404(b) evidence for abuse of discretion. United States v. McDermott, 64 F.3d 1448, 1456 (10th Cir.1995), cert. denied, 116 S.Ct. 930 (1996). An abuse of discretion "is not merely an error of law or judgment, but an overriding of the law by the exercise of manifestly unreasonable judgment or the result of impartiality, prejudice, bias or ill-will as shown by evidence or the record of proceedings." United States v. Wright, 826 F.2d 938, 943 (10th Cir.1987).
 
 
 92
 In Huddleston v. United States, 485 U.S. 681, 688 (1988), the Court noted that in adopting rule 404(b) "Congress was not nearly so concerned with the potential prejudicial effect of Rule 404(b) evidence as it was with ensuring that restrictions would not be placed on the admission of the evidence." The Court concluded that defendants against whom the government seeks to offer 404(b) evidence are protected against unfair prejudice from four sources: (1) "the requirement of Rule 404(b) that the evidence be offered for a proper purpose;" (2) "the relevancy requirement of rule 402 as enforced through rule 104(b);" (3) "the assessment the trial court must make under Rule 403 to determine whether the probative value of the similar acts evidence is substantially outweighed by its potential for unfair prejudice"; and (4) rule "105, which provides that the trial court shall, upon request, instruct the jury that the similar acts evidence is to be considered only for the proper purpose for which it was admitted." Huddleston, 485 U.S. at 691-92. We apply these four requirements to determine whether evidence is admissible under 404(b). See United States v. Record, 873 F.2d 1363, 1375 (10th Cir.1989).
 
 
 93
 We note at the outset that although Turley challenges the admission of 404(b) evidence, he does not identify specific items which were introduced at trial nor does he cite the record. We thus do not know which evidence Turley believes was improperly admitted. However, from our review of the record it is clear that the trial judge did not abuse his discretion in admitting any 404(b) evidence against Turley.
 
 
 94
 Turley makes two separate arguments that 404(b) evidence was admitted in error. First, he alleges that evidence of bad acts committed after the commission of the acts alleged in the indictment could not have been admitted to show intent, as such evidence would only show intent subsequent to the alleged crimes. He does not identify the specific bad act or acts. However, the government notes that Turley appears to be referring to evidence of an accident with Kenny Callahan (count 33 of the superseding indictment) which occurred in St. Charles, Missouri on September 30, 1991, a few weeks after the accident in Houston was to have occurred (count 32).[8]
 
 
 95
 Evidence of the St. Charles accident was admitted through the testimony of Jill Turley who was with Mr. Turley for the accident. XI R. at 205-12. According to her, George Turley told Callahan he would pay him two thousand dollars to stage the accident in St. Charles. Callahan hit George Turley's 1986 Ferrari three times because the first two times did not do enough damage. They then called the police and the police took a report. Upon returning to Kansas City, George Turley attempted to get admitted to Shawnee Mission Hospital but the hospital would not admit him. Turley "got mad" and the next day was admitted to a different hospital, where he stayed for 7-10 days. He then filed claims under his insurance policies for this hospital stay.
 
 
 96
 Turley's counsel did not object to the admission of this 404(b) evidence. In addition, prior to Jill Turley's testimony, the district judge stated that "I'll wait until this witness concludes her testimony and I'll give one limiting instruction with it." Turley's counsel replied "That sounds fair." XI R. at 186. At the close of Turley's testimony, the court gave an appropriate instruction, limiting the consideration of the evidence to proving state of mind, intent, motive, opportunity, plan, or lack of accident or mistake. XII R. at 421-22. In addition, during jury instructions the judge gave another limiting instruction. V R. doc. 457, instruction 11. We conclude that the trial judge's decision to admit the evidence of the St. Charles accident complied with the requirements of Huddleston and was not an abuse of discretion.
 
 
 97
 We also reject Turley's general claim that no 404(b) evidence should have been admitted. We have reviewed the instances identified by the government where 404(b) evidence was admitted. In each of those instances, the 404(b) evidence was properly admitted to show intent, opportunity, motive, plan, or lack of mistake or accident. And in each case the district judge gave appropriate limiting instructions. See X R. at 36; XX R. at 224-25; XXII R. at 726-27; XXIII R. at 803-04.[9] Far from abusing his discretion, the district judge required the government to satisfy the Huddleston requirements in each of the identified instances. We therefore reject Turley's claim that 404(b) evidence was improperly admitted.
 
 C. Admission of Coconspirator Statements
 
 98
 Turley next challenges, on hearsay grounds, the admission of coconspirator statements. We review the admission of hearsay evidence for abuse of discretion, according greater deference to the trial court's hearsay rulings because the determination whether the evidence is hearsay rests heavily on the facts of a particular case. United States v. Porter, 881 F.2d 878, 882 (10th Cir.), cert. denied, 493 U.S. 944 (1989). The court's findings on whether statements were made during the course of and in furtherance of the conspiracy will not be disturbed unless clearly erroneous. United States v. Perez, 989 F.2d 1574, 1580 (10th Cir.1993) (en banc).
 
 
 99
 Turley argues that hearsay statements were admitted "concerning events which occurred as to [the Bonner Springs, Lawrence, and Joplin accidents] which were not part of a conspiracy charged and of which the hearsay declarant was not present so as to provide confrontation." Brief of Appellant at 30. We reject his claim.
 
 
 100
 Coconspirator statements are admissible even if the conspiracy is not specifically charged. United States v. Coppola, 526 F.2d 764, 770 (10th Cir.1975). For such statements to be admitted under Fed.R.Evid. 801(d)(2), though, the trial court must find by a preponderance of the evidence that (1) a conspiracy existed, (2) the declarant and the defendant against whom the declarations are offered were members of the conspiracy, and (3) the statements were made in the course of and in furtherance of the conspiracy. United States v. Mobile Materials, Inc., 881 F.2d 866, 869 (10th Cir.1989), cert. denied sub nom. Philpot v. United States, 493 U.S. 1043 (1990). In determining whether a conspiracy existed, "the district court may consider and rely on the actual coconspirator statements the government seeks to admit...." United States v. Owens, 70 F.3d 1118, 1124 (10th Cir.1995).
 
 
 101
 Turley asserts that coconspirator statements were erroneously admitted during the testimony of nine government witnesses, although he does not identify the specific statements he challenges. Brief of Appellant at 30. We have examined the testimony of these witnesses and find only one instance where the court admitted evidence over Turley
 
 
 102
 ' § 801(d)(2)(E) objections. During the testimony of Kelly Chadwick Baldwin, Turley's former girlfriend, the government inquired: "Did Mr. Gravatt ever tell you whether or not he owed Turley money?" Baldwin answered: "Yes, he did." X R. at 16. Turley's counsel objected on the basis of 801(d)(2)(E). The court overruled the objection. Id. The court then admitted, again over Turley's objection, Baldwin's testimony that Gravatt explained to her that "George was the one that got him started in the insurance fraud." Id. at 17. However, the court stated that the testimony was admitted "subject to my making another finding in a moment or two."[10] Id.
 
 
 103
 Baldwin then testified that according to Gravatt, Turley "would give him the money up front to get him started." X R. at 17-18. At this point, Turley's counsel asked for, and was given, a continuing objection. Baldwin testified further about what Gravatt told her about Turley. See id. at 18-19. The judge then took a recess and said that he was going "to ask [the prosecutor] to tell me why I shouldn't reverse the ruling I just made about admitting this under Rule 801(d)(2)(E)." Id. at 20. The prosecutor was unable to convince the district judge, who candidly admitted that he thought he had incorrectly admitted the hearsay against Turley. Id. at 30. The judge instructed the jurors to disregard as to Turley the statements Gravatt made to Baldwin, concluding that "as a matter of law [ ] no conspiracy existed at that time...." Id. at 34. After giving the instruction, the judge asked counsel "Is that the kind of limiting instruction, counsel wished the Court to give?" Turley's counsel replied "sounds fair to me." Id. at 35. We believe that the trial court's actions corrected any prejudice which may have resulted from the erroneous admission against Turley of Baldwin's testimony. In addition, any error in the ruling on the hearsay objection was harmless. See Kotteakos v. United States, 328 U.S. 750, 765 (1946).
 
 D. Double Jeopardy Claim
 
 104
 Turley claims that he was subjected to double jeopardy because the government brought an earlier civil forfeiture action against him before the instant prosecution. He concedes that this issue was not raised below, and thus we review only for plain error under Fed.R.Crim.P. 52(b). However, a violation of the Double Jeopardy Clause would be plain error. United States v. 9844 S. Titan Court, Unit 9, Littleton, Colorado, 75 F.3d 1470, 1481 (10th Cir.1996). The record of the civil forfeiture action is sparse. However, even if we assume that Turley's version of events is correct, we conclude there was no violation of the Double Jeopardy Clause.
 
 
 105
 On October 15, 1991, a forfeiture complaint against Turley's real and personal property was filed on behalf of the United States. That complaint alleged that Turley's property was involved in transactions or instrumentalities of a crime in violation of 18 U.S.C. §§ 1956, 1957, 1341 and 1343, and 26 U.S.C. §§ 7201 and 7206(1), and therefore was subject to forfeiture under 18 U.S.C. § 981. On October 16, 1991, the search warrant was executed and Turley's property was seized. Turley filed a claim and answer to the forfeiture complaint on October 24, 1991. Turley asserts that jeopardy attached in the forfeiture action. We disagree.
 
 
 106
 It is undisputed that there was no hearing or settlement of the forfeiture action prior to the criminal trial. United States v. McDermott, supra, decided this issue against a defendant under circumstances similar to those presented here. On appeal McDermott argued that the criminal proceeding constituted double jeopardy. We affirmed, noting
 
 
 107
 We have previously held that for purposes of multiple prosecution analysis, jeopardy did not attach in an administrative debarment proceeding before the adjudicative hearing stage. See [United States v.] Bizell, 921 F.2d at 266 [ (1990) ]. We now hold that jeopardy cannot attach any earlier for multiple punishment purposes, at least where a defendant does not settle a case and thus incur civil "punishment" before an adjudicative hearing. ... This civil proceeding never got to a hearing or a settlement, so jeopardy cannot have attached.
 
 
 108
 64 F.3d at 1455 (emphasis added).
 
 
 109
 McDermott is directly on point. Here the civil forfeiture case against Turley never reached a hearing or settlement. Therefore, jeopardy did not attach and Turley's criminal prosecution did not violate the Double Jeopardy Clause.
 
 
 110
 E. Use of Evidence Obtained During Plea Negotiations
 
 
 111
 Turley claims that the trial court violated his due process rights by admitting evidence revealed to the government during plea negotiations in December 1991. He does not identify what, if any, such evidence was admitted or where in the record it was admitted.
 
 
 112
 Turley filed a pretrial motion to suppress, pursuant to Fed.R.Crim.P. 11(e)(6) and 12(b)(3), statements made during plea negotiations and all evidence derived therefrom. I R. doc. 121. A hearing on the motion was held on July 26, 1993, at which Turley, William Grimshaw (Turley's attorney in the civil forfeiture case who was present at the plea negotiations), and IRS Agent David Christmore testified. XVIII R. doc. 626. In denying the motion to suppress, the district court found the testimony of Grimshaw and Christmore to be generally credible. III R. doc. 227 at 7. The judge stated that
 
 
 113
 the uncontroverted testimony of Special Agent Christmore has established that no information was gained from the 1991 plea negotiations with defendant Turley which the government did not already have. The government is not precluded from using information it derived from an independent source simply because defendant Turley also discussed the information during plea negotiations.
 
 
 114
 The court therefore denies defendant Turley's motion to suppress at this time. Defendant Turley may make a contemporaneous objection during trial if the government attempts to use any specific statement made by him during the course of the 1991 plea negotiations against him.
 
 
 115
 Id. at 8-9.
 
 
 116
 Turley has not identified any place in the record where the government offered against him any specific statements from the plea negotiations nor any contemporaneous objection to such evidence. In our review of the record, including the affidavit of Turley's former attorney Carl Cornwell and the other attachments to Appellant's Reply Brief, we have found nothing to indicate that the government used any statements from the negotiations against Turley at trial. Therefore, we reject Turley's claim.
 
 
 117
 We also uphold the district court's denial of Turley's motion to suppress. "We are mindful that at a hearing on a motion to suppress, the credibility of the witnesses and the weight given to the evidence, as well as the inferences and conclusions drawn therefrom, are matters for the trial judge." United States v. Fernandez, 18 F.3d at 876. After examining the transcript of the suppression hearing, XVIII R. doc. 626, we conclude that the district judge's findings of fact are not clearly erroneous and that his denial of the motion to suppress was proper.
 
 F. Compulsory Process Claim
 
 118
 Turley claims that the district court violated his right to compulsory process when it refused to grant writs of habeas corpus ad testificandum for inmates Brownfield, Guzman, and Guhl.
 
 
 119
 In order to show a violation of the Sixth Amendment right to compulsory process, the defendant must show "that the evidence lost would be both material and favorable to the defense." United States v. Valenzuela-Bernal, 458 U.S. 858, 873 (1982). The determination whether a requested witness is necessary to an adequate defense is within the trial court's discretion. United States v. Rogers, 921 F.2d 1089, 1094 (10th Cir.1990), supplemented on reh'g, 925 F.2d 1285, cert. denied, 501 U.S. 1211 (1991). However, the Fifth and Sixth Amendments require that the trial court give due consideration to the constitutional rights involved. United States v. Greschner, 802 F.2d 373, 378 (10th Cir.1986), cert. denied, 480 U.S. 908 (1987).
 
 
 120
 Turley claims the testimony of Brownfield, Guzman, and Guhl was crucial to his defense and to impeach the testimony of government witnesses William Langford, Tammy Guzman, and Claudia Lang. Brief of Appellant at 45. During the trial, the district judge held an ex parte hearing on Turley's requests for writs of habeas corpus ad testificandum. The judge granted Turley's requests and issued writs for inmates Eddie Cox, George Bruton, and Steve St. John. XXV R. at 1350-58. However, he denied the requests as to Brownfield, Guzman, and Guhl.
 
 
 121
 Turley submitted that Guzman would testify (1) that William "Langford attempted to solicit him to rip-off Mr. Turley"; and (2) that Tammy Guzman, his wife, immediately after her wreck with Turley, told Mr. Guzman a different story from what she testified to in court. Id. at 1353. The court refused the request stating that Guzman was "a very dangerous prisoner. He's made so many attempts to escape. And his relationship appears to the Court to be so tangential...." Id.
 
 
 122
 Turley submitted that Brownfield's testimony would controvert the testimony of Langford and Cathy Ward. Id. at 1354. The court took this request under advisement, but later denied it. Id.; XXVI R. at 1656-57. The court reasoned that Brownfield's testimony would be tangential, peripheral, cumulative and that it would be difficult to bring Brownfield into court because he was incarcerated in state prison. He also concluded that Turley's proffer was speculative in nature. Id.
 
 
 123
 Turley suggested that Guhl would testify that Langford encouraged him to rip-off Turley. XXV R. at 1356. Defense counsel conceded that since the court denied the request for Guzman to testify, the defense "wouldn't have much luck with Mr. Guhl either as his testimony would be somewhat tangential...." Id. at 1356-57.
 
 
 124
 The government notes that Daryl Guzman was in prison at the time of the accident in which Turley claimed to be in Tammy Guzman's car, and thus any knowledge he had would have been based on hearsay. As to Brownfield, the government asserts that there is nothing but speculation that his testimony would have been favorable to the defense. As for Guhl, his testimony would not have established that Turley never sent money to inmates for participating in the staging of accidents.
 
 
 125
 We conclude Turley has failed to make a sufficient showing that the testimony of the three inmates would be both material and favorable to his defense. Thus, under Valenzuela-Bernal, Turley has not shown that his compulsory process rights were violated. Therefore, the district court did not abuse its discretion in denying Turley's requests for writs of habeas corpus ad testificandum for Guzman, Brownfield, and Guhl.
 
 G. Jury Instructions
 
 126
 Turley argues that the district court did not properly instruct the jury with regard to the money laundering charges (counts 34-35, 18 U.S.C. § 1956(a)(1)(A)(I), and count 69, 18 U.S.C. § 1957), asserting that the instructions given by the district judge should have required, but did not, that the government show a "specific intent that the funds claimed would be plowed back into the criminal venture." Appellant's Brief at 47.
 
 
 127
 Because Turley did not object to the instructions given, we review only for plain error. United States v. Toledo, 985 F.2d 1462, 1465 (10th Cir.), cert. denied, 114 S.Ct. 218 (1993). "We will not reverse the lower court for faulty instructions unless the error is 'both obvious and substantial' and 'undermine[s] the fundamental fairness of the trial and contribute[s] to a miscarriage of justice.' " Id. (quoting United States v. Mitcheltree, 940 F.2d 1329, 1334 (10th Cir.1991)).
 
 
 128
 Turley challenges jury instructions 31-39, arguing that those instructions were "insufficient to inform the jury of what it must determine to find the defendant knew the funds involved a financial transaction and he had the intent to further a criminal venture." Brief of Appellant at 46-47. At bottom his argument appears to be that he could be guilty of money laundering only if it was shown that he used proceeds from a specified unlawful activity only to further additional illegal activity. This argument boils down to an assertion that the proceeds from the specified unlawful activity cannot be commingled with other funds. In United States v. Johnson, 971 F.2d 562, 570 (10th Cir.1992), we rejected this argument, noting that were we to follow it we "would allow individuals to avoid prosecution simply by commingling legitimate funds with proceeds of crime. This would defeat the very purpose of the money-laundering statutes."
 
 
 129
 We have reviewed the entire charge and feel that it accurately stated the applicable law. There was no error, let alone plain error, in instructions 31-39.
 
 H. Turley's Criminal History Category
 
 130
 Finally, Turley challenges his sentence. "While we must give 'due deference to the district court's application of the guidelines to the facts,' 18 U.S.C. § 3742(e), we review the application of the guidelines fully for errors of law." United States v. Smith, 900 F.2d 1442, 1445 (10th Cir.1990).
 
 
 131
 Turley's criminal history was determined to be category VI. He argues that the government intentionally delayed resolving the charges in the trial below so that it could obtain guilty pleas from him on other charges (separate conspiracy and wire fraud charges) and then use those convictions to increase his criminal history at sentencing in this case. These other conspiracy and wire fraud cases stemmed from events which occurred after the offenses charged in the trial below. Turley argues that the convictions stemming from these later events cannot constitute "prior" convictions because the "term 'prior convictions' would necessarily imply [sic] to a conviction occurring before the commission of the instant offense." Brief of Appellant at 43. We disagree.
 
 
 132
 In United States v. Walling, 936 F.2d 469 (10th Cir.1991), we squarely rejected the argument Turley advances. We held that "sentences imposed after commission of an offense for which a criminal history score is being calculated constitute 'prior sentences' for purposes of that calculation." Id. (emphasis added) (citing Smith, 900 F.2d 1442). We noted that Smith established that "the chronology of sentencing rather than the commission of the crimes [is] controlling." Walling, 936 F.2d at 471.
 
 
 133
 Here although the conspiracy and wire fraud offenses were committed after the offenses at issue in this case, the sentences for those offenses were imposed prior to the sentence in this case. Under Walling and Smith those sentences are "prior sentences" which are taken into account in determining Turley's criminal history for sentencing in this case. The determination that Turley's criminal history was category VI was therefore proper and his sentence is upheld.
 
 III
 CONCLUSION
 
 134
 Accordingly, we AFFIRM the convictions and sentences of Turley, Abram, and Gravatt appealed in Nos. 94-3368, 94-3369 and 94-3370.
 
 
 
 **
 The Honorable Sven Erik Holmes, United States District Judge for the Northern District of Oklahoma, sitting by designation
 
 
 *
 This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3
 
 
 [1]
 Third-party administrators are "middlemen" between individual association groups and insurance carriers. XXIII R. at 938
 
 
 [1]
 Turley was convicted of 2 counts of mail fraud, 17 counts of mail fraud and aiding and abetting, 1 count of conspiracy, 2 counts of money laundering, 4 counts of making false statements on tax returns, and 1 count of engaging in a monetary transaction in criminally derived property. He was sentenced to a total term of imprisonment of 135 months and 3 years' supervised release, and ordered to pay restitution in the amount of $33,970 and a special assessment of $1350. Wiley Keith Abram was convicted of 8 counts of mail fraud and aiding and abetting, 2 counts of mail fraud, 1 count of conspiracy, 5 counts of money laundering, and 3 counts of making false statements on tax returns and aiding and abetting. He was sentenced to a total term of imprisonment of 60 months and 3 years' supervised release and ordered to pay restitution of $11,460 and a special assessment of $950. James Gravatt was convicted of 3 counts of mail fraud and aiding and abetting, 4 counts of mail fraud, 7 counts of money laundering, 2 counts of making false statements on tax returns, and 1 count of failure to file an income tax return. He was sentenced to 51 months' imprisonment and 3 years' supervised release and ordered to pay restitution of $7,495 and a special assessment of $850
 Sandra Abram pled guilty to 1 count of mail fraud and 1 count of making a false statement on a tax return. She was sentenced to 10 months' imprisonment and 3 years' supervised release, and ordered to pay restitution of $945 and a $100 special assessment. Her appeal is addressed by this panel in a separate order and judgment, No. 94-3434.
 
 
 [2]
 Gravatt also claims that Winney was the only witness who supplied direct evidence of scienter. However, the government disputes that position, asserting that Claudia Lane's testimony that Gravatt flashed the lights on his van to let her know to pull into the street to hit him is also evidence of scienter. We need not decide which party is correct because although Winney's testimony was damaging, we are concerned only with unfair prejudice. Even if Winney did supply the only direct evidence of scienter, that fact demonstrates only some damaging effect on Gravatt, not unfair prejudice
 
 
 [3]
 Paragraph 122 of the presentence report (PSR) states:
 The losses of the Mail Fraud for the defendant are, therefore, $21,070.00 for the Kansas City, Missouri accident and $155,968.00 for the Lawrence accident, for a sub-total of $177,038.00, plus the relevant conduct amounts for the checks disbursed to the Abrams in the amounts of $23,205.00 for the Lawrence accident and $51,260.00 for the Kansas City, Missouri accident for a sub-total of $74,465.00. This resulted in a total loss of $230,433.00. Therefore, pursuant to U.S.S.G. § 2F1.1(b)(1)(I), since the loss was more than $200,000.00 but less than $350,000.00, the offense level is increased by 8 levels.
 Supp. Vol. I at 20 (emphasis added). However, p 117 states:
 Specific Offense Characteristics: Pursuant to U.S.S.G. § 2F1.1(b)(1), the base offense level is increased by losses identified. According to the Government, the loss attributed to hospitalizations in which the defendant was hospitalized and was a policyholder was $26,100.00 in 1988, $62,890.00 in 1989, and $66,978.00 in 1990, for a total of $155,968.00. This amount does not include payments for lost wages.
 Id. at 19 (emphasis added).
 
 
 [4]
 The further claims of omissions and errors in the charge dealt with refusal to modify the circumstantial evidence instruction, refusal to give two requested instructions concerning statements and acts in furtherance of conspiracy but occurring outside the presence of Mr. Abram, error in the reasonable doubt instruction given, refusal to give a drug or alcohol abuser credibility instruction, failure to give a requested inconsistent statement impeachment instruction, and failure to give a requested instruction on impeachment of a witness by a felony conviction. Opening Brief of Appellant Wiley Keith Abram at 11-13
 
 
 [5]
 Abram also appears to claim that his defense was incompatible with Turley's. We disagree. Turley's defense was that the accidents were not staged. Abram's defense was that the government could not meet its burden of proof. These are not incompatible defenses
 
 
 [6]
 Section 3109 provides:
 The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.
 
 
 [7]
 This should be file document 227
 
 
 [8]
 Count 33 of the superseding indictment charged Callahan and Turley with mail fraud arising out of the accident in St. Charles. This count was severed, II R. doc 158, and is not at issue in this appeal
 
 
 [9]
 We note that the trial judge required the government to do more than just recite the laundry list of other purposes under rule 404(b). See XXII R. at 785-96; XXIV R. at 1151
 
 
 [10]
 We have recognized that "in certain instances where it is not 'reasonably practicable to require the showing [of a conspiracy] to be made before admitting the evidence, the court may admit the statements subject to being connected up." United States v. Cardall, 885 F.2d at 669 (internal quotation marks and citations omitted). The preferred practice, however, is to admit the statements only after the conspiracy has been shown. Id