UNITED STATES COURT OF APPEALS
Filed 8/21/96
TENTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

RICHARD K. BENTLEY,

Defendant-Appellant.

No. 95-3384
(D.C. No. 94-10063-01)
(D. Kan.)

ORDER AND JUDGMENT[*]

Before KELLY, LOGAN, and BRISCOE, Circuit Judges.

Richard K. Bentley appeals the district court's denial of his motion to suppress evidence found in a search of his car, and the sentence imposed for the crime of possession of a firearm by a felon.  We affirm.

I.

On the evening of March 22, 1994, Lieutenant Dunbar of the Wichita police saw an early 1970's dark green over light green Chevrolet Malibu that matched the description of a car that had been used in several armed robberies over the past two months.  There

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

had been another robbery on March 22 and, although the car was not observed at that robbery, the robber matched the description of the robber who had used the green Chevrolet in prior robberies. Officers on patrol that day were alerted to watch for the car.

Dunbar noticed the Chevrolet as it was stopped at a stop sign on a side street. There was little traffic, but the Chevrolet waited until Dunbar's police car had gone two blocks before it moved past the stop sign and turned in the same direction as the police car. At about 8:40 p.m., Dunbar turned the police car into a left turn lane and after the Chevrolet passed, he pulled the police car behind the Chevrolet and signaled for it to stop. The car stopped and Bentley, who matched the description of the robber, got out. Dunbar checked Bentley's driver's license and ran a license and warrants check. A backup unit of two additional officers arrived at 8:44 p.m., and Dunbar explained to Bentley they were investigating a series of robberies involving a green Chevrolet and asked if Bentley cared if they searched his car. Bentley replied, "No, you can even search the trunk if you want to." RIII 10. Although Dunbar did not recall if he told Bentley he had the right to refuse, a backup officer testified that "we let it be known that the individual didn't have to let us search." RIII 40.

Dunbar searched the car while the backup officers interviewed Bentley. Bentley told the backup officers that he had served time in prison for burglary and robbery. One of the backup officers noticed the license plate on the Chevrolet was wired on with twist-ties in a manner that permitted it to be flipped up so it was obscured from view. Although the officers at the scene may not have known, a witness to one of the robberies had seen the robber flip up his license plate after the robbery and this was known to the task force investigating the robberies. Dunbar found clothing in the back seat of the car that

2

matched the description of clothing worn by the robber. The search was completed before 9:00 p.m. Dunbar called to ask that an agent from the task force investigating the robberies be sent to the scene, and an agent was dispatched. Bentley got into his car to leave. There was evidence that at some point during the stop, the officers returned Bentley's license, but the record does not reflect when it was done. Dunbar asked Bentley to wait a little longer, and Bentley said "no problem." Dunbar testified that they would not have prevented Bentley from leaving if he had refused to stay.

Agent Laughrey arrived at 9:50 p.m. and asked for permission to search the car. Bentley said "no problem." Laughrey found a nickel plated .25 caliber semiautomatic pistol. The robber had displayed a small chrome-finished pistol in two of the robberies. Bentley was arrested. When he was told that the FBI wanted to talk to him about his possible involvement in the robberies, Bentley said, "You've got the clothes and the gun, there's no need in me saying anymore." Presentence Report 5.

Bentley was charged with three counts of robbery, three counts of using or carrying a firearm while committing a crime of violence, and one count of possession of a firearm by a felon. After the district court denied Bentley's motion to suppress evidence found in the car, Bentley entered into a conditional plea agreement under which he pleaded guilty to possession of a firearm by a felon in return for dismissal of the other charges.

II.

Dunbar had reasonable suspicion to justify the initial stop. The car matched the description of the car used in several recent robberies and it was driven in a manner that suggested the driver was trying to avoid the police car. These were sufficient grounds for

3

a brief detention of the car and the driver for investigation. See United States v. Fernandez, 18 F. 3d 874, 878 (10th Cir. 1994) (evasive action is factor supporting stop); United States v. Morgan, 936 F. 2d 1561, 1567-68 (10th Cir. 1991), cert. denied 502 U.S. 1102 (1992) (stop of persons who matched description of robbers upheld).

Bentley argues the circumstances permitted only a driver's license and warrants check and any detention after the checks were completed was unlawful. The record shows that Dunbar completed the checks about the time the backup officers arrived. Almost immediately, he requested and received consent to search the car and the backup officers took more complete information from Bentley. This was not a stop for a traffic infraction, but an investigative stop of a suspected armed robber. The officers were acting within their authority when they detained Bentley to obtain more complete information. They asked Bentley if he had been in trouble with the law and ran checks on his car tag and vehicle identification number, as well as another check for outstanding warrants. The officers' actions did not exceed the scope of a reasonable investigative stop. See 4 Wayne R. LaFave, Search and Seizure § 9.2(f) (1996).

Because the stop and detention were justified, the consent to the first search did not need to satisfy the heightened standard for consensual searches following a Fourth Amendment violation. See United States v. McCurdy, 40 F. 3d 1111, 1119 (10th Cir. 1994). There is nothing in the record to suggest the consent was anything other than voluntary, knowing, and intelligent. Although there were three uniformed officers present, the record reveals it was standard procedure to provide backup for nighttime stops and there was nothing unusually coercive about the stop and detention. Bentley was told that he could refuse consent.

4

The first search of the car revealed clothing that fit the description of the robber's clothing, and Bentley fit the description of the robber. Nonetheless, the officers did not believe they had sufficient grounds to arrest Bentley and they were prepared to allow him to leave. The test for whether a person is detained is whether a reasonable person would have believed he or she was free to leave. The record supports the conclusion that a reasonable person would have felt free to leave. Bentley's driver's license was returned to him. After the first search, Bentley asked the officers to back up their cars to give him room to leave and he got into his car. Obviously, he believed he was free to leave. This supports the conclusion that Bentley was not detained at that point.

Bentley consented to remain until Laughrey arrived. There is nothing in the record to suggest that Bentley's consent was coerced. The officers did nothing that was particularly coercive, except perhaps to block Bentley's car with their own, but they testified he had room to back around them, and Bentley was not so coerced as to be unable to ask the police to move their cars. Bentley was not detained during the wait for Laughrey. The record supports the conclusion that he remained voluntarily. Nor is there anything in the record to suggest that Bentley's consent to a search by Laughrey was involuntary.

## III.

The district court ruled that Bentley's offense level was increased from 33 to 34 under U.S.S.G. § 4B1.2(1), based on a finding that the gun found in his car was used in a crime of violence. Bentley contends there was insufficient evidence to support a conclusion that the firearm was used in a crime of violence. We review the district court's fact findings for clear error and its application of the guidelines de novo. United States v.

5

Bruce, 78 F. 3d 1506, 1509 (10th Cir. 1996). We will not reverse the district court unless the court's findings are without factual support in the record. United States v. Beaulieu, 893 F. 2d 1177, 1182 (10th Cir. 1990).

Bentley, his car, the car's license plate attachment, the clothing found in his car, and the gun found in his car matched descriptions from the robberies. When questioned about his involvement in the robberies, Bentley replied, "You've got the clothes and the gun, there's no need in me saying anymore." Bentley argues his statement is ambiguous when viewed in context. This argument does not aid Bentley because it only highlights this court's role in the review of the question presented. What Bentley meant by the statement was a question of fact for the district court to resolve. The evidence presented was sufficient to satisfy the preponderance of the evidence standard.

AFFIRMED.

Entered for the Court

Mary Beck Briscoe
Circuit Judge